LEGAL AID SOCIETY OF HAWAII,
et al., Plaintiffs,

v.

LEGAL SERVICES CORPORATION,
Defendant.

Civil No. 97–00032 ACK.

United States District Court,
D. Hawaii.

Aug. 1, 1997.

Paul Alston, Bradford L. Tannen, Alston, Hunt, Floyd & Ing, Honolulu, HI, Stephen V. Bomse, Charles N. Freiberg, Adam M. Cole, Rakesh K. Anand, Robert A. Rosenfeld, Heller, Ehrman, White & McAuliffe, San Francisco, CA, Stanley E. Levin, Davis, Levin, Livingston, Grande, Honolulu, HI, Hope L. Hudson, Heller, Ehrman, White & McAuliffe, Palo Alto, CA, Steven R. Shapiro, Robin L. Dahlberg, American Civil Liberties Union, New York City, Margaret C. Crosby, American Civil Liberties Union Foundation of Northern CA, San Francisco, CA, for plaintiffs.

Daniel A. Bent, Carlsmith, Ball, Wichman, Murray, Case, Mukai & Ichiki, Honolulu, HI, Thomas S. Williamson, Jr., Georgia Kazakis, Ernest A. Young, Erika F. King, Covington & Burling, Washington, DC, for defendant.

Michael Chun, U.S. Attys. Office, Honolulu, HI, Jeffrey S. Markowitz, Dept. of Justice, Washington, DC, for intervenor.

### ORDER GRANTING THE LSC'S AND DOJ'S MOTIONS FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

KAY, Chief Judge.

### SUMMARY

Plaintiffs essentially prevailed at the preliminary injunction stage because this Court ruled that the LSC regulations violated the unconstitutional conditions doctrine. *Legal Aid Society of Hawaii v. Legal Services Corporation*, 961 F.Supp. 1402, 1420 (D.Haw. 1997). Importantly, LSC regulations prohibiting lobbying for welfare reform were enjoined so that lobbying was allowed during the past critical legislative session during which the Federal government was turning over to the states much of the welfare function.

In seeking a preliminary injunction, Plaintiffs asserted that the ruling of the Supreme Court in *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233, regarding adequate alternate channels for speech was dispositive. This Court concurred, and the LSC has subsequently amended its regulations in basic compliance with *Rust*. Seemingly, Plaintiffs had achieved their primary objec-

tives in this suit. However, Plaintiffs now contend that *Rust* is not controlling and in any event the LSC has not conformed to the regulations in *Rust*. Plaintiffs also raise additional arguments.

With regard to the motions before the Court, the Court grants LSC and DOJ's motion for summary judgment and denies Plaintiffs' motion for summary judgment. For the same reasons, the Court dissolves its earlier injunction, which additionally is moot because it is based on superseded regulations that no longer affect the parties.

The Court reads the new regulations as allowing a LSC funded organization to control another organization that engages in restricted activities so long as all the insularity and separate incorporation requirements of the regulations are satisfied. With this ability to control the separately-incorporated and insular second organization, the Court finds that alternative channels exist for LSC-funded organizations to exercise their constitutionally protected rights such as lobbying the legislature. Thus, the LSC-funded legal aid societies will be able to control affiliates who care for the needs of the poor in areas from which the regulations restrict the societies.

The insularity requirements have already been upheld in *Rust* and the Court finds Plaintiffs' many efforts to distinguish the case unpersuasive. Unlike *Rust*, however, the regulations here also require that an affiliate be separately incorporated. Nevertheless, the Court does not find that the separate incorporation requirement limits the availability of alternate channels any more than the insularity requirement alone did in *Rust*. Accordingly, the addition of the separate incorporation requirement does not make these regulations unconstitutional. Moreover, the Court finds the LSC regulations are just as narrowly tailored as the regulations in *Rust* and that their burdens do not exceed those in *Rust*; except as to the separate incorporation requirement, which the Court finds to be de minimis and which was allowed in *Regan v. Taxation with Rep-*

*resentation of Washington*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129, The Supreme Court ruled in *TWR* that the separate incorporation requirement was "not unduly burdensome."

The Court also finds that these regulations do not violate Plaintiffs' Due Process or Equal Protection rights.

### FACTUAL BACKGROUND

On February 14, 1997, this Court granted in part Plaintiffs'[1] motion for a preliminary injunction (hereinafter "order"). *See Legal Aid Society of Hawaii v. Legal Services Corporation*, 961 F.Supp. 1402 (1997). A general background of this case can be found in that order. *Id.* at 1406–07.

On March 3, 1997, Plaintiffs filed a motion for reconsideration of the Court's order. The Legal Services Corporation ("LSC") filed an opposition to the motion for reconsideration on March 14, 1997. In their opposition, the LSC attached as an exhibit an amended regulation concerning the use of Non–LSC funds, 62 Fed.Reg. 12101. *See* LSC's opposition, Appendix A. The interim regulation added language modeled after the restrictions upheld by the Supreme Court in *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). On April 9, 1997, in response to this amendment, the Court *sua sponte* issued an order to show cause whether the provision (62 Fed.Reg. 12101) moots Plaintiffs' reconsideration motion. On May 21, 1997, the LSC issued the final regulation which deviated significantly from the interim rule. *See* 62 Fed.Reg. 27696.

On April 14, 1997, Magistrate Kurren held a pretrial conference. At the conference, the government (hereinafter the "DOJ") was allowed to intervene via stipulation by the parties. In addition, the Plaintiffs agreed to withdraw their reconsideration motion. Magistrate Kurren also set the instant hearing date and briefing schedule.

In accordance with the schedule, the DOJ and LSC both filed motions for summary

---

**1.** As stated in its initial order, the term Plaintiffs as used in this case refers to ten different parties: (1) the Legal Aid Society of Hawaii ("LASH"), (2) Legal Services of Northern California ("LSNC"), (3) San Fernando Valley Neighborhood Legal Services ("SFNLVS"), (4) Legal Aid Society of Orange County ("LASOC"), (5) Alaska Legal Services Corporation, (6) California State Client Council ("CSCC"), (7) Hawaii Justice Foundation, (8) The Impact Fund, (9) Lloyd Van De Car, and (10) Gary F. Smith.

judgment on May 23, 1997. The Plaintiffs filed an opposition and a counter-motion for summary judgment on June 20, 1997. On July 3, 1997, the LSC and the DOJ filed their oppositions. On July 17, 1997, the Plaintiffs filed their reply. On July 28, 1997, the Court held a hearing.

### STANDARD OF REVIEW

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). One of the principal purposes of the summary judgment procedure is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. "If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact [citations omitted], the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

Rather, Rule 56(e) requires that the nonmoving party set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *T.W. Elec. Serv.,* 809 F.2d at 630. At least some "significant probative evidence tending to support the complaint" must be produced. *Id.* Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

The standard for a grant of summary judgment reflects the standard governing the grant of a directed verdict. *See Eisenberg v. Ins. Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511.

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Moreover, the United States Supreme Court has stated that "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Indeed, "if the factual context makes the nonmoving party's claim *implausible,* that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." *Franciscan Ceramics,* 818 F.2d at 1468 (emphasis in original) (citing *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356). The Ninth Circuit, however, has held that courts should not determine whether direct evidence (as opposed to circumstantial evidence) is implausible because to do so would be to weigh the evidence. *McLaughlin v. Liu,* 849 F.2d 1205, 1207 (9th Cir.1988). Moreover, all evidence and inferences to be drawn therefrom must be construed in the light most favorable to the nonmoving party. *T.W. Elec. Serv.,* 809 F.2d at 630–31.

### DISCUSSION

#### I. The issue before the Court

On February 14, 1997, after reviewing the relevant case law,[2] this Court issued a 42

---

**2.** For purposes of the preliminary injunction, the parties and the Court all agreed that *Regan v.*

*TWR,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) ("*TWR*"), *FCC v. League of Women*

page order enjoining the enforcement of numerous LSC restrictions because they placed an unconstitutional condition on the legal aid organizations. The crux of the Court's decision was that the LSC's inter-related organization provision did not provide a legal aid organization alternate channels in which to exercise certain First Amendment rights.[3]

The LSC has since made significant modifications to its inter-related provision.[4] The question before the Court today is whether it should invalidate the new regulations because they do not cure the constitutional defects that led to the issuance of the first injunction. To that question, the Court now turns.

Whether the new regulations pass constitutional muster depends on the resolution of the following issue:

> does a legal aid organization's ability to control a separate legal organization with separate personnel and facilities provide an alternative channel for the exercise of the first legal aid organization's constitutional rights as required by the unconstitutional conditions doctrine.[5]

For reasons to be explained, the Court answers this question in the affirmative and thereby DENIES Plaintiffs' motion for summary judgment. The Court also finds that Plaintiffs have not created a material issue of fact concerning the constitutional viability of the regulations. Accordingly, the Court

---

*Voters*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (*"League"*), and *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (*"Rust"*) controlled the query of whether the LSC restrictions constituted an "unconstitutional condition."

3. Plaintiffs now argue that the Court should apply a least restrictive alternative option in deciding this motion. The Court, however, finds the least restrictive alternative analysis inapplicable because it finds that Plaintiffs' constitutional rights are not infringed. The Court finds that Plaintiffs' constitutional rights are not infringed because Plaintiffs have ample alternative channels in which to exercise their constitutionally protected activities. In any event, if the least restrictive analysis applies, the Court finds that the LSC regulations are as narrowly tailored in *Rust* and the burdens do not exceed those upheld in *Rust*.

4. The relevant regulation states:

(a) A recipient must have objective integrity and independence from any organization that engages in restricted activities. A recipient will be found to have objective integrity and independence from such an organization if:
(1) The other organization is a legally separate entity;
(2) The existence of separate accounting and timekeeping records;
(3) The recipient is physically and financially separate from the other organization. Mere bookkeeping separation of LSC funds from other funds is not sufficient. Whether sufficient physical and financial separation exists will be determined on a case-by-case basis and will be based on the totality of the facts. The presence or absence of any one or more facts will not be determinative. Factors relevant to this determination shall include but will not be limited to:
(i) The existence of separate personnel;

(ii) The existence of separate accounting and timekeeping records;
(iii) The degree of separation from facilities in which restricted activities occur, and the extent of such restricted activities; and
(iv) The extent to which signs and other forms of identification which distinguish the recipient from the organization are present.
(b) Each recipient's governing body must certify to the Corporation within 180 days of the effective date of this part that the recipient is in compliance with the requirements of this section. Thereafter, the recipient's governing body must certify such compliance to the Corporation on an annual basis.

5. As evident, this opinion will focus primarily on the legal aid organization's constitutional rights that provided the basis for the injunction. In the motion for preliminary injunction, however, Plaintiffs also argued that the regulations placed an unconstitutional condition on the legal aid attorneys. Plaintiffs re-raised this argument in their briefs but did not argue it at the hearing. After careful review, however, the Court finds this argument without merit. As the Supreme Court noted in *Rust:* "The employees' freedom of expression is limited during the time that they actually work for the project; but this limitation is a consequence of their decision to accept employment in a project, the scope of which is permissibly restricted by the funding authority." *Rust*, 500 U.S. at 199, 111 S.Ct. at 1775. Here, the LSC funded attorney cannot engage in certain restricted activities but that is a consequence of accepting full-time employment with a LSC funded organization. The LSC funded attorney can choose to work elsewhere or he can work part-time for the LSC funded organization and part-time for another organization that engages in restricted activities. Thus like the doctors in *Rust*, the lawyers "remain free, however, to pursue ... [restricted activities] when they are not acting under the auspices of the ... [federally funded] project." *Id.* at 198, 111 S.Ct. at 1775.

GRANTS the LSC and DOJ's motion for summary judgment.

## II. *The New Regulations*

The new regulations place two general requirements on the ability of legal aid organizations to create "alternate channels." The first is that the second organization must have separate personnel and facilities from the first organization. The Court will refer to these requirements under the rubric of "insularity." The second requirement is that the second organization must be a "legally separate entity." *See* 45 C.F.R. § 1610.8.

The factors behind the "insularity" requirement were modeled after the regulations upheld by the Supreme Court in *Rust.*[6] Therefore, because *Rust* may have already resolved many of the issues before the Court today, the parties correctly focus on the applicability of *Rust.*

Needless to say, the LSC clearly believes that *Rust* should control this Court's decision. *See* 62 Fed.Reg. 27697 (stating that the inter-related provision was "fashioned after the program integrity standard found to be constitutional in *Rust v. Sullivan* by the Supreme Court, see 500 U.S. 173 [111 S.Ct. 1759, 114 L.Ed.2d 233] (1991).") On the other hand, Plaintiffs argue that *Rust* does not apply because: (1) the facts of this case are much different than those at issue in *Rust;* and (2) the regulations in *Rust* distinguished between a project and a recipient whereas these regulations do not.

### 1. *The Court rejects Plaintiffs' efforts to distinguish this case from Rust*

At the outset, it should be noted that the Plaintiffs argued rather vehemently in the motion for a preliminary injunction that *Rust* applied to this case. The LSC (and the Court) agreed. Now that the LSC has attempted to comply with the dictates in *Rust,* however, the Plaintiffs argue that *Rust* does not apply.

Plaintiffs first argue that the Supreme Court upheld the insularity requirement in *Rust* because a separate bookkeeping requirement was impossible. According to the Plaintiffs, a separate bookkeeping requirement in *Rust* was impossible because "the doctor-patient interaction is not so easily categorized." *See* Plaintiffs' motion for summary judgment, pg. 16.

The Court rejects this argument. It is no more difficult for a doctor to categorize his conversation with a patient than it is for a lawyer to do so with his client. Both professions engage in confidential communication involving a wide (and often unforeseeable)

---

**6.** Compare the insularity regulation at issue here:

> (3) The recipient is physically and financially separate from the other organization. Mere bookkeeping separation of LSC funds from other funds is not sufficient. Whether sufficient physical and financial separation exists will be determined on a case-by-case basis and will be based on the totality of the facts. The presence or absence of any one or more facts will not be determinative. Factors relevant to this determination shall include but will not be limited to:
> (i) The existence of separate personnel;
> (ii) The existence of separate accounting and timekeeping records;
> (iii) The degree of separation from facilities in which restricted activities occur, and the extent of such restricted activities; and
> (iv) The extent to which signs and other forms of identification which distinguish the recipient from the organization are present.

with the insularity regulations at issue in *Rust:*
> A title X project must be organized so that it is physically and financially separate, as determined in accordance with the review established in this section, from activities which are prohibited under section 1008 of the Act and § 59.8 and § 59.10 of these regulations from inclusion in the title X program. In order to be physically and financially separate, a title X project must have objective integrity and independence from prohibited activities. Mere bookkeeping separation of title X funds from other monies is not sufficient. The Secretary will determine whether such objective integrity and independence exist based on a review of facts and circumstances. Factors relevant to this determination shall include (but are not limited to):
> (a) The existence of separate accounting records;
> (b) The degree of separation from facilities (e.g. treatment, consultation, examination, and waiting rooms) in which prohibited activities occur and the extent of such prohibited activities;
> (c) The existence of separate personnel;
> (d) The extent to which signs and other forms of identification of the title X project are present and signs and material promoting abortion are absent.
> *See* 42 C.F.R. § 59–9 "Maintenance of program integrity."

range of topics. As the LSC points out, moreover, doctors are routinely required by government entities and insurers to categorize their activities. *See e.g.* 42 C.F.R. § 415.60(g)(1) (requiring timekeeping by doctors under Medicare). Thus, the fact that the insularity restrictions affect lawyers as opposed to doctors is of no consequence and the holding in *Rust* still applies.

Plaintiffs also argue that unlike Title X (the program at issue in *Rust*), the LSC is not "designed 'to a convey a governmental message.'" *See* Plaintiffs' Motion for Summary Judgment, pg. 18. The Court likewise finds this argument unpersuasive. Congress does not control the analysis and advice of either a Title X doctor or a LSC lawyer except for prohibiting advice in certain areas such as abortion. *See Rust*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("The doctor is always free to make clear that advice regarding abortion is simply beyond the scope of the program. In these circumstances, the general rule that the Government may choose not to subsidize speech applies with full force.")

Plaintiffs also argue that this case differs from *Rust* because it involves litigation a traditional sphere of expression—whereas *Rust* did not. *See* Plaintiffs' Motion for Summary Judgment, pg. 21 ("The sphere of litigation, like that of a university, is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the ... First Amendment.", *quoting, Rust*, 500 U.S. at 200, 111 S.Ct. at 1776.) In making this argument, Plaintiffs misconstrue the language in *Rust*. The Court in *Rust* did not state that "the Government's ability to control speech within" a traditional sphere of expression violates the First Amendment *per se*. Instead, the Court held

that government's forays into the traditional spheres are "restricted **by the vagueness and overbreadth** doctrines of the First Amendment." *See Rust*, 500 U.S. at 200, 111 S.Ct. at 1776. Here, however, Plaintiffs have not alleged that the restrictions are vague or overbroad. Thus, even assuming that litigation is a traditional sphere of expression, the language relied upon by the Plaintiffs does not distinguish this case from *Rust*.

As evident, Plaintiffs' efforts to distinguish *Rust* fail because as Plaintiffs argued in their motion for preliminary injunction, *Rust* is one of the major Supreme Court pronouncements on the doctrine of unconstitutional conditions and is highly relevant to this case.

■ Concluding that *Rust* applies, the Court finds it dispositive on the constitutionality of an insularity requirement.[7] Thus, if the LSC restrictions simply required separate personnel and facilities, under *Rust* that would be constitutionally permissible.

III. *The Regulations at issue here do limit the availability of alternate channels more than the regulations in Rust did, but still are constitutionally permissible*

As Plaintiffs argue, however, the regulations at issue here go further than the ones in *Rust* because they require that the alternative organization be a "legally separate entity." *See* 62 Fed.Reg. 27700. As such, the regulations here narrow the availability of alternative channels more than the ones in *Rust*, albeit to a de minimis extent.[8]

For instance, as the Court noted in its initial order, example 5 of the regulations in *Rust* stated that:

An organization that operates a title X project engages in lobbying to increase the legal availability of abortion as a method of

---

7. In upholding an insularity requirement, the Court in *Rust* found that a:

Title X grantee c[ould] continue to perform abortions, provide abortion related services, and engage in abortion advocacy; it simply [wa]s required to conduct those activities through programs that are separate and independent from the project that receives funds. *Rust*, 500 U.S. at 196, 111 S.Ct. at 1773–74. This reasoning applies here.

8. In some respects, however, the regulations in *Rust* are more stringent than those at issue here. A Title X project could not even "provide referral for abortion as a method of family planning." *See Rust*, 500 U.S. at 179, 111 S.Ct. at 1765. Here, LSC organizations are free to refer clients to any organization for any reason.

family planning. The project itself engages in no such activities and the facilities and funds of the project are kept separate from prohibited activities. The project is not in violation of paragraph (a)(1) of this section. *See* 42 C.F.R. § 59.10(b)(5). Under the instant regulations, however, an organization could not engage in any restricted activities regardless if "the facilities and funds of the project" were kept separate unless the various projects were separate legal entities. Thus, as the Plaintiffs have argued, the regulations in *Rust* distinguish between projects whereas the instant regulations distinguish between recipients. *See* Plaintiffs' motion for summary judgment, pg. 10. The issue is whether this distinction is constitutionally significant.

1. *Plaintiffs' arguments, however, do not focus on how the regulations differ from Rust (i.e., the recipient/project distinction) but on the similarities with Rust, (i.e., the insularity requirement)*

The only distinction between focusing on recipients rather than projects is that the recipient requirement requires the entity engaging in restricted activities be separately incorporated. After all, in *Rust*, the projects still had to have separate personnel and facilities. Yet, rather than focus on the burden of the separate incorporation requirement, Plaintiffs still focus on the burden of the insularity requirement despite the Supreme Court's imprimatur on such requirements in *Rust*.[9]

Plaintiffs argue that alternate channels are obtainable only with some difficulty. *See e.g.* Declaration of Victor Geminiani, Executive Director of LASH, ¶ 16 ("The restriction against **shared space** would be prohibitively expensive to implement")[10]; Declaration of Roberta Ranstrom, Executive Director of LSNC, ¶ 2 ("Complying with Final Rule 45 C.F.R. Part 1610, particularly the requirements of **maintaining separate staff and facilities** to handle restricted activities, would impose extreme burdens on LSNC."); Declaration of Neal S. Dudovitz, Executive Director of SFVLNS, ¶ 5 ("To create a second organization that could receive non-LSC funds and remain sufficiently separate as to not **share common offices or staff** as the Final Rule appears to require, would force the SFVNLS to break apart its centralized, resulting in a number of difficulties and problems."); Declaration Robert J. Cohen, Executive Director of LASOC, ("[A] serious question would arise as to whether the hotline could provide advice and referral services for an affiliate or subcontractor without violating numerous restrictions and requirements of the new rule, including indirect **subsidy, separation of personnel, and separation of facilities**"); Declaration of Robert K. Hickerson, Executive Director of ALSC, ¶ 8 ("As a practical matter, compliance with the separate facilities and **separate personnel requirements** of Final Rule 45 C.F.R. Part 1610 would be all but unworkable.").

Even assuming that Plaintiffs on a practical level may experience some difficulty abiding by the insularity requirement, that would not be constitutionally dispositive. The unconstitutional conditions doctrine does not require regulations to eliminate all practical difficulties in pursuing the alternative channels in order to pass constitutional muster. If it did, few regulations concerning the use of congressional money would be constitutional.

500 U.S. at 198, 111 S.Ct. at 1775.

---

**9.** In particular, the Supreme Court in *Rust* has stated that:

> By requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has, consistent with our teachings in *League of Women Voters* and *Regan,* not denied it the right to engage in abortion-related activities. Congress has merely refused to fund such activities out of the public fisc, and the Secretary has simply required a certain degree of separation from the Title X project in order to ensure the integrity of the federally funded program.

**10.** *See also* Geminiani Declaration ¶ 14 ("As a practical matter, the new regulation would effectively prevent any of LASH's six offices with only one attorney (or less) from engaging in constitutionally protected activities, even with non-LSC funds. Three of those offices are the only LASH office on their island, so that the **prohibition against shared staff** would effectively end advocacy in connection with LSC-restricted activities for the isolated populations of those islands.")

For instance, in *Rust*, the Court held that the regulations did not impose an unconstitutional condition on Title X employees because "the regulations, which govern solely the scope of the Title X project's activities, do not in any way restrict the activities of those persons acting as private individuals." *Id.* at 198–99, 111 S.Ct. at 1775. Yet, it does not seem unlikely that certain Title X employees would be unable to pursue abortion-related advocacy on their free time. As an example, a Title X employee may have familial duties or other financial needs which require that he work full-time for Title X plus childcare issues or other demands that preclude him from using his free time to engage in abortion-related activities. In that case, on a practical level, Title X restrictions according to Plaintiffs' argument would constitute an unconstitutional condition on that employee, i.e., in order to receive the benefit of working for a Title X project, he forfeits his First Amendment rights to engage in abortion advocacy. However, it pushes the bounds of reason to believe that the Supreme Court would have invalidated Title X simply because of this employee's difficulties in exercising his constitutional rights.

Yet, that is what the Plaintiffs are asking the Court to do here. For example, LASH states that to engage in LSC restricted activities in their one attorney Molokai office it would need to either "(i) reduce from full-time to part-time status the lawyers at LASH's single lawyer offices and hire part-time employees to do LSC restricted work, or (ii) discontinue LSC-restricted activities." *See* Dudovitz Declaration, ¶ 14–15. The declaration goes on to say that "[b]ecause of the unavailability of people with the required talents, interest or abilities to work only part-time, it will be virtually impossible on some islands to employ part-time to engage in LSC-restricted activities." *Id.* In other words, Plaintiff is arguing that the LSC restrictions are unconstitutional because if the LASH's Molokai office decided to engage in restricted activities, it may not be able to provide the same caliber attorney as it does now. This, like the fictitious Title X employee, is no basis for striking down the entire LSC scheme. Moreover, LASH has many

practical options for maintaining its Molokai office. LASH can create an affiliate organization that engages in restricted activities on one of the other islands and simply refer any cases involving the restrictions arising out of Molokai to that office. LASH can also divert moneys from its other offices to fund a full-time non-LSC funded office on Molokai.[11] These latter options illustrate just a few of the possible alternatives LASH has for exercising its constitutional rights even in its Molokai office.

2. *The Supreme Court has previously found the separate incorporation requirement not to be unduly burdensome*

The Supreme Court has found the requirement of separate incorporation not "unduly burdensome." *See Regan v. TWR*, 461 U.S. 540, 544 n. 6, 103 S.Ct. 1997, 2000 n. 6, 76 L.Ed.2d 129. (1983). In *TWR*, the Supreme Court upheld IRS regulations that only granted tax exemptions to non-profit corporations which did not lobby because TWR "could obtain tax deductible contributions for its non-lobbying activity by returning to the dual structure it used in the past, with a § 501(c)(3) organization for non-lobbying activities and a § 501(c)(4) organization for lobbying." *Id.* In noting the availability of alternative channels, the Court addressed an argument that the IRS could "make it impossible for a § 501(c)(3) organization to establish a § 501(c)(4) affiliate." The Court rejected the argument noting that:

> The IRS apparently requires only that the two groups be separately incorporated and keep records adequate to show that tax deductible contributions are not used to pay for lobbying. **This is not unduly burdensome.**

*Id.* at 544 n. 6., 103 S.Ct. at 2000 n. 6. Under *TWR*, therefore, the requirement of separate incorporation alone does not seem to pose any serious constitutional infirmities.

█ The issue, therefore, is whether the separate incorporation requirement combined with the insularity requirement impermissibly restricts a legal aid organization's alternative channels.

---

**11.** The amended regulations allow a LSC funded organization to transfer non-LSC funds to its affiliate without subjecting that affiliate to the LSC's restrictions.

The requirement of separate incorporation does not in any significant way add to Plaintiffs' burden. After all, under the *Rust*-approved restrictions, Plaintiffs will already need to have separate facilities and separate personnel if they decide to engage in restricted activities. As groups consisting of attorneys, moreover, Plaintiffs' burden in filing incorporation papers cannot be deemed excessive. Consonant with these common sense observations, Plaintiffs have not proffered any facts that the separate incorporation requirement imposes any significant burden. Thus, the Court finds that the combination of the separate incorporation requirement with the dictate concerning separate personnel and facilities does not create an unconstitutional burden on Plaintiffs' exercise of their constitutional rights. Plaintiffs can still create a separate organization with different facilities through which to exercise their constitutional rights.

3. *The ability to control the alternate organization differentiates the present regulations from the previous regulations*

■ Plaintiffs argue that allowing a completely separate entity with different facilities and personnel to engage in the constitutionally protected restrictions does nothing for the original LSC funded entity which cannot engage in such activities. *See* Plaintiffs' motion for summary judgment, pg. 25. The Court agrees. As the Supreme Court noted in *TWR*, "It hardly answers one person's objection to a restriction on his speech that another person, outside his control, may speak for him." *See TWR*, 461 U.S. 540, 553, 103 S.Ct. 1997, 2005 (Blackmun, J., concurring).

The Court, however, reads the new regulations as allowing the original entity to exercise control over the second entity as long as the other requirements of § 1610.8 are met. The Court adopts this reading for three reasons.

First, the LSC in its briefs and at the hearing acknowledge that the new regulations allow a LSC-funded organization to completely control an affiliate that engages in restricted activities as long as § 1610.8 is met. In fact, at the hearing, the LSC stated that the two organizations (i.e., the LSC funded organization and its affiliate) could have overlapping boards of directors thereby assuring, on a practical level, the LSC funded organization's ability to control its affiliate.

Second, as the Supreme Court in *Rust* stated: "a decision to declare an Act of Congress unconstitutional 'is the gravest and most delicate duty that this Court is called on to perform.'" *Rust*, 500 U.S. at 191, 111 S.Ct. at 1771. Thus, " 'as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.'" *Id.* at 190, 111 S.Ct. at 1771, *citing Blodgett v. Holden*, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927) (opinion of Holmes, J.). Here, following the adage of Justice Holmes, the Court interprets the regulations in the manner most likely to salvage them.[12]

Lastly, in amending the regulations, the LSC deleted the provisions concerning "control" of the affiliated organizations that troubled this Court in its initial order. *See* 50 Fed.Reg. § 49279, *Legal Aid*, 961 F.Supp. at 1415. The Court reads this deletion as intentional and significant and as allowing an organization that receives LSC funds to control another organization that engages in restricted activities so long as the two organizations comply with the present regulations.

The commentary to the final inter-related provision (62 Fed.Reg. § 27700) supports the Court's interpretation. To understand the significance of the changes, however, some background is needed. After the Court's order, the LSC issued interim regulations on March 14, 1997.[13] The interim regulations

---

**12.** In addition, the Plaintiffs must overcome the facial challenge doctrine. As the Court stated in its earlier order:

> Because Plaintiffs challenge the facial validity of the regulations, Plaintiffs must establish that no set of circumstances exists under which the Act would be valid. The fact that [the regula-

tions] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid.'
*Legal Aid*, 961 F.Supp. 1402, 1417, *quoting, Rust v. Sullivan*, 500 U.S. at 183, 111 S.Ct. at 1767.

**13.** These regulations spurred the Court to issue its show cause order on April 7, 1997.

maintained the previous "control" centered policy (struck down in the Court's initial order) in section (a), but created an exception for organizations that fulfilled the requirements set out in a section (b). *See* 62 Fed. Reg. 12103–4. The requirements in section (b) mirror much of the language of the current regulations.

Before issuing its final regulation at issue here, however, the LSC deleted section (a) of the interim regulation. In the commentary to the present regulations, the LSC explains why it deleted the language concerning control. In particular, the LSC explained that:

> The purpose of the [previous inter-related] policy was to establish whether a relationship existed between the recipient and another organization, such that the recipient and the other organization actually operated as one, rather than two separate organizations. **The Board determined that if a program is found to be in compliance with the second step of the program integrity test, there would be sufficiently separate identity and operational independence.from the recipient.**

*See* 62 Fed.Reg. 27697 (emphasis added). The control provision was deleted, therefore, because the precursor to the present regulations achieved the insularity that Congress sought to create between the organizations that receive LSC funds and their affiliates that may engage in restricted activities. Accordingly, the Court finds as long as the requirements set forth in the regulations are met, a LSC-funded organization can exercise control over affiliate organizations that engage in restricted activities.

With the ability to control the separately incorporated and insular second organization, the Court finds that alternative channels exist for LSC-funded organizations to pursue their constitutionally protected activities. Thus, even construing the facts most favorably to the Plaintiffs [14], the regulations do not constitute an unconstitutional condition and thus are not violative of Plaintiffs' First Amendment rights.

### IV. *Plaintiffs' Equal Protection and Due Process arguments*

In their motion for summary judgment, Plaintiffs also renew their numerous Due Process and Equal Protection complaints. The Plaintiffs' complaints focus on the effect the restrictions have on the indigent clients of the legal aid organizations.

#### 1. The *CSCC has standing to assert the rights of the indigent clients*

In their briefs, the DOJ argues that the Plaintiffs lack standing to bring claims on behalf of their clients. *See* DOJ's Motion for Summary Judgment, pg. 24.

To have standing to bring suit, Plaintiffs must prove: (1) "an injury in fact;" (2) "a causal relationship between the injury and the challenged conduct;" and (3) "a likelihood that the injury will be redressed by a favorable decision." *Northeastern Florida Contractors v. Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993). The "injury in fact" requires an "invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent', not 'conjectural' or 'hypothetical'." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

In addition, parties seeking prospective injunctive relief "must show that [they] 'ha[ve] sustained or [are] immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate,' not 'conjectural or hypothetical'." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id.*

Moreover, Plaintiffs at the summary judgment stage "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment will be taken to be true." *Lujan*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2137, 119 L.Ed.2d 351 (1992).

---

**14.** At the hearing, Plaintiffs acknowledged that this case did not contain any material issues of fact and was "ripe" for summary judgment whichever way the Court decided to rule.

In the reply to their motion for summary judgment,[15] Plaintiffs assert that indigent clients are parties to this action through the California State Client Council ("CSCC") and are being denied access to the courts because of the LSC regulations. *See* Plaintiffs' reply, pg. 17, *citing* Declaration of Lucinda Horne attached to Plaintiffs' motion for a preliminary injunction. Clearly, the CSCC is not a client *per se*, but it is an "unincorporated association ... whose members are indigent clients." *See* Horne Declaration, ¶ 3–4. As an association, CSCC may have standing to bring this action if the association alleges " 'such a personal stake in the outcome of the controversy' as to warrant ... invocation of federal-court jurisdiction' ". *Havens Realty Corporation v. Coleman*, 455 U.S. 363, 378–79, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982).

 CSCC has done as much here. Through the Horne declaration, CSCC claims that its "own organizational efforts have been adversely affected by LSC restrictions ... because the new LSC restrictions have prevented some legal services programs, such as LASOC, from using LSC money." Thus, the Court finds that CSCC has alleged an "injury-in-fact." *See Havens Realty*, 455 U.S. at 379, 102 S.Ct. at 1124–25 (holding that impairment of an organization's aims constitutes an "injury-in-fact"). The "injury-in-fact", moreover, can be linked to the restrictions at issue here and likewise would be redressed if the Court were to strike down the restrictions. Accordingly, the Court finds that the CSCC has standing to challenge the restrictions on behalf of the clients.[16]

2. *Plaintiffs' Due Process arguments fail for the same reason that the Court in Rust rejected the argument that the Title X regulations violated the petitioners' Fifth Amendment right to terminate their pregnancy*

Plaintiffs assert a whole array of Due Process arguments including: (1) the indigent clients' right to retain and consult counsel of their choice, and (2) the indigent clients' right to engage in meaningful advocacy. The Court has serious questions concerning the breadth and viability of these constitutional rights. Nevertheless, even assuming that these rights are recognized, the Court finds that they are not violated by the LSC regulations.

The basis of the Court's decision, once again, is the Supreme Court's decision in *Rust*. In *Rust*, the petitioners argued that the restrictions that sought to insulate abortion related activity from federally funded activities violated the constitutionally protected right to have an abortion. *Rust*, 500 U.S. at 201, 111 S.Ct. at 1776–77. The Court rejected the argument finding that "the regulations do not impermissibly burden a woman's Fifth Amendment rights." *Id.* Among other reasons, the Court ruled as such because:

Congress' refusal to fund abortion counseling and advocacy leaves a pregnant woman with the same choices as if the Government had chosen not to fund family-planning services at all. The difficulty that a woman encounters when a Title X project does not provide abortion counseling or referral leaves her in no different position than she would have been if the Government had not enacted Title X.

*Id.*

 This reasoning controls the result here. To begin with, the right asserted in *Rust* was far more established and recognized than the amorphous rights asserted here. *See e.g. Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). In addition, and more significantly, the Court notes that Congress' refusal to fund the restricted activities here leaves the indigent clients with the same choices they would have had absent the creation of the LSC. For instance, take the case of an indigent client that wanted to challenge a welfare law. Under the current regulatory scheme,

**15.** Remarkably, the Plaintiffs did not respond to the DOJ's standing argument in their opposition to said motion.

**16.** The Supreme Court, moreover, has held that attorneys have third-party standing to assert the constitutional rights of their clients. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n. 3, 109 S.Ct. 2646, 2651 n. 3, 105 L.Ed.2d 528.

such a client could only enlist a legal aid organization that received no federal funding[17] because the LSC bars an organization that receives LSC funds from accepting such a client.[18] Yet, if Congress decided to terminate the LSC, the client's choices would not diminish. The client could still only bring his case to non-federally funded organizations. Thus, like the petitioners in *Rust*, "the difficulty ... [this indigent client encounters when a LSC organization does not provide legal assistance] leaves [the client] in no different position than he would have been if the Government had not [created the LSC]." Accordingly, the regulations cannot be deemed to "impermissibly burden" whatever Due Process rights the client may have.

In addition, as the Court has noted in its earlier discussion, the LSC restrictions allow a LSC-funded organization ample alternative channels to pursue its constitutionally protected rights. The availability of these alternative channels seriously reduces whatever impact these regulations have on the poor because the legal aid organizations' ability to create affiliates should result in the proliferation of many new organizations that can accept cases such as ones challenging the welfare laws.[19]

### 3. *Equal Protection Arguments*

■ Lastly, Plaintiffs assert various Equal Protection arguments in support of their motion for summary judgement. Their first argument is that the regulations discriminate based on poverty. *See* Plaintiffs' summary judgment motion, pg. 31 (restrictions deny "legal services clients equal access to the courts based on their indigence and the causes they wish to espouse."). As the Court noted in the previous order, however, the Supreme Court " 'has never held that financial need alone identifies a suspect class for purposes of equal protection analysis.' " *Legal Aid*, 961 F.Supp. 1402, 1411 n. 10, *quoting Maher v. Roe*, 432 U.S. 464, 470–71, 97 S.Ct. 2376, 2380–81, 53 L.Ed.2d 484 (1977). Therefore, any discrimination against the poor need only have a rational basis to pass constitutional muster. Clearly, the reasons proffered by Congress here pass such review.

Plaintiffs also submit a list of activities ranging from class actions to challenging immigration reform that they assert is barred to indigent clients by the restrictions. The Court does not exactly understand this argument. If this list is simply another take on the suspect class argument, then it fails for the reasons stated above. If it seeks to assert an Equal Protection argument based on the discriminatory distribution of fundamental rights then it fails for different reasons.

■ Plaintiffs acknowledge the long line of cases holding that the government need not fund the exercise of a fundamental right. *See Harris v. McRae*, 448 U.S. 297, 315, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980). Thus, the lack of federal funding for the various rights listed by the Plaintiffs cannot rise to an Equal Protection violation. Plaintiffs, however, seem to be indicating that the regulations' impact on non-federal funds does violate the Equal Protection clause. The LSC, however, cannot be held culpable if private parties decide to fund groups with certain subject matter limitations. After all, under LSC regulations, all donors of contributions exceeding $250 must be notified of the restrictions and presumably, if dissatisfied with the restrictions, can place their money elsewhere (e.g. with the federally funded organization's affiliate). *See* 62 Fed. Reg. § 27699. If private parties still decide to fund groups despite the LSC restrictions, that is a question more of that donor's First Amendment right to donate money (*see e.g. Buckley v. Valeo*, 423 U.S. 820, 96 S.Ct. 32, 46 L.Ed.2d 36 (1975)) than the indigent client's Equal Protection rights. According-

---

17. The hypothetical client, of course, has numerous other options in pursuing his case including enlisting a private attorney on a contingency basis, enlisting a private attorney on a *pro bono* basis, or pursuing the suit himself.

18. In addition, the Court notes that under the regulations as interpreted, the federally funded organization could create a separate non-federally funded organization which could take all its prohibited cases.

19. This reasoning applies as well to Plaintiff's Equal Protection argument.

·ly, under either theory, Plaintiffs fail to establish a viable Equal Protection claim.[20]

Because Plaintiffs fail to establish that the regulations violate either their First Amendment, Due Process or Equal Protection rights, the Court DENIES their motion for summary judgment. For the·same reasons, the Court also DISSOLVES its earlier injunction, which additionally is moot because it was based on superseded regulations that no longer affect the parties. *See e.g. Sannon v. United States*, 631 F.2d 1247, 1250 (5th Cir.1980) ("That newly promulgated regulations immediately applicable to litigants in a given case can have the effect of mooting what once was a viable case is without doubt."); *see also Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission*, 680 F.2d 810, 814 (D.C.Cir.1982) ("Corrective action by an agency is one type of subsequent development that can moot a previously justiciable issue.").

### CONCLUSION

For the foregoing reasons, the Court GRANTS the LSC's motion for summary judgment and the DOJ's motion for summary judgment but DENIES Plaintiffs' motion for summary judgment. IT IS SO ORDERED.

**20.** In their reply, Plaintiffs also argue that "the challenged restrictions are an acknowledged attempt at viewpoint regulations." Plaintiffs, however, did not raise this argument in their moving papers in violation of the Local Rules which state that "any arguments raised for the first time in the reply shall be disregarded." *See* Local Rule 220–4. Granted, Plaintiffs raised this argument in the preliminary injunction but the Local Rule 220–4 envisions bringing all the arguments in the instant moving papers thereby allowing the opposing party to address the argument for sake of this hearing.

The Plaintiffs, moreover, did not raise the argument at the hearing. Nevertheless, the Court finds Plaintiffs' viewpoint discrimination claim without merit. In *Rust*, the petitioners argued that Title X's prohibition on abortion related advocacy constituted viewpoint discrimination. The Supreme Court disagreed. Instead, the Court opined that:

the Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternate program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.

*Rust*, 500 U.S. at 193, 111 S.Ct. at 1772. The Court finds this holding fully applicable and dispositive of Plaintiffs' argument. The LSC can fund certain cases without funding others and not engage in viewpoint discrimination.