Carmen VELAZQUEZ, Wep Workers Together!, Community Service Society of New York, Inc., New York City Coalition to End Lead Poisoning, Centro Independiente De Trabajadores Agricolas, Inc., and Greater New York Labor–Religion Coalition, on behalf of all similarly situated individuals, organizations and their members; namely, individuals and organizations who are, or wish to be, represented by lawyers employed by entities receiving funds from the Legal Services Corporation, and who wish to assert legal claims as members of a class, or to benefit from some other legal advocacy activity proscribed by Pub.L. 104–208;

Farmworkers Legal Services of New York, Inc., on behalf of itself, and on behalf of all similarly situated not-for-profit legal services entities; namely, organizations who wish to be eligible to receive funds from the Legal Services Corporation, and who wish to be free to engage in legal advocacy activities that are proscribed by Pub.L. 104–208;

Lucy A. Billings, Peggy Earisman, Olive Karen Stamm, Jeanette Zelhof, Elisabeth Benjamin, Jill Ann Boskey, and Lauren Shapiro, on behalf of each, and on behalf of all similarly situated individuals; namely, attorneys employed or formerly employed by entities receiving funds from the Legal Services Corporation who wish to be free to represent indigent individuals in class actions, and to engage in other attorney-client activities that are proscribed by Pub.L. 104–208; and

Andrew J. Connick, Councilmember C. Virginia Fields, Councilmember Guillermo Linares, Councilmember Stanley Michels, Councilmember Adam Clayton Powell, IV, Senator Lawrence Seabrook, and Assemblyman Scott M. Stringer, on behalf of themselves and all similarly situated individuals; namely, individuals who have provided public or private non-

federal funding to entities that also receive funds from the Legal Services Corporation, and who wish these funds to be used for legal advocacy activities that are proscribed by Pub.L. 104–208, Plaintiffs,

v.

**LEGAL SERVICES CORPORATION, Defendant.**

No. 97–CV–182 (FB).

United States District Court, E.D. New York.

Dec. 22, 1997.

Burt Neuborne, Brennan Center for Justice, New York City, Peter M. Fishbein, Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City, for Plaintiffs.

Alan Levine, Stephen A. Wieder, Stephen L. Ascher, Kronish, Lieb, Weiner & Hellman LLP, New York City, for Defendant Legal Services Corp.

Jeffrey S. Markowitz, U.S. Dept. of Justice, Civil Div., Washington, DC, for Intervenor–Defendant U.S.

## MEMORANDUM & ORDER

BLOCK, District Judge.

Plaintiffs challenge the constitutionality of certain provisions of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub.L. No. 104–134, § 504, 110 Stat. 1321 (1996), which were re-enacted by the Omnibus Consolidated Appropriations Act of 1997, Pub.L. No. 104–208, § 502, 110 Stat. 3009 (1996) (hereinafter collectively referred to as the "Act"), as implemented by regulations which were issued subsequent to the commencement of this lawsuit. The Act prohibits attorneys and organizations that receive federal monies from defendant Legal Services Corporation ("LSC") from engaging in a large number of activities (the "prohibited activities"), such as lobbying, challenging welfare reform legislation, and participating in class action litigation. The Act also provides that such LSC-funded attorney or entity ("recipients") cannot engage in any of the prohibited activities even if funding for the prohibited activity were to come from non-federal sources. However, implementing regulations issued by the LSC after the commencement of the litigation allow recipients to engage in the prohibited activities by affiliating with legal services organizations that do not receive any federal monies from the LSC.

Presently before the Court is plaintiffs' motion for preliminary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.[1] Plaintiffs contend that the Act's restrictions, as implemented by the LSC's regulations, are facially violative of the First and Fifth Amendment rights of recipients, as well as attorneys for, clients of, and donors to, those recipients.[2] The Court disagrees and, regarding the implementing regulations, holds that they are a permissible construction of the Act and are appropriately tailored

1. On March 24, 1997, the Court held a preliminary injunction hearing ("Hearing") and entertained oral argument from the parties.

2. Plaintiffs' amended complaint seeks class certification for each of these groups. The parties have agreed that the issue of class certification need not be decided pending the Court's determination of the preliminary injunction motion.

to the Government's legitimate interests. The Court accordingly denies the motion for preliminary injunctive relief.

## BACKGROUND

### I. The Legal Services Corporation & The Statutory Restrictions

Congress created the LSC in 1974 in response to, *inter alia*, the "need to provide high quality legal assistance to those who would be otherwise unable to afford adequate legal counsel and to continue the present vital legal services program." 42 U.S.C. § 2996(2). The LSC is a nonprofit corporation charged with distributing federal funds, in the form of grants, to recipients nationwide that provide legal assistance to low-income individuals. In 1995, LSC recipient organizations served approximately 1,900,000 indigent clients, encompassing over 1,700,000 matters, which benefitted almost 5,000,000 people living in poverty.[3] The LSC has thus been described as "the primary vehicle for insuring that the poor are included in this nation's legal system." [4] Recipients generally rely on both LSC funds and monies raised from a variety of public and private sources [5] to finance their operations.

Despite the success of the LSC in meeting the legal needs of the poor, controversy has surrounded the LSC since its inception. This controversy has focused on the extent to which recipients should be limited in their use of LSC funds. At one end of the spectrum, critics of the LSC charge that recipients often use federal funds to advance activist agendas, and that broad limitations are necessary to ensure that LSC funds are spent to meet the basic legal needs of the poor. At the other end, opponents of such restrictions argue that activist litigation is necessary to assist impoverished individuals, and that the vast majority of LSC funds are used to help the poor in so-called "basic" legal proceedings.

In response to this debate, Congress has repeatedly placed restrictions on the permissible uses of federal funds by recipient organizations. For example, the 1974 Act prohibited the use of LSC funds by any recipient to provide legal assistance in any case seeking to obtain a nontherapeutic abortion. 42 U.S.C. § 2996f(b)(8). The 1974 Act and implementing regulations also restricted recipients from participating in the following areas: political activity, criminal proceedings, training, school desegregation, lobbying, violations of the Military Selective Service Act, and fee-generating cases. 42 U.S.C. §§ 2996f(b)(1)-(4), (6)-(10). In 1989, the LSC extended the restrictions to include redistricting cases. 45 C.F.R. § 1632. The present dispute arises from the latest round of congressional debate and compromise, which resulted in continued funding for the LSC, but with an additional set of restrictions on recipients of LSC funds.

Although restrictions on LSC funds have been commonplace since Congress created the LSC, the Act is unique because the restrictions apply, for the first time, to recipient activities that are supported by non-federal public funds. Previously, recipients were allowed to use non-federal funds from public sources as they pleased so long as accounting practices documented the segregation of federal and non-federal funds.[6] Thus, while the former statute provided that "[n]o funds made available by [LSC] may be used" for any of the prohibited activities, 42 U.S.C. § 2996f(b), the new statute provides that "[n]one of the funds appropriated [by

---

3. S. Rep. 104–392, at 13 (1996).

4. *Id.*

5. These sources include: state and local grants, IOLA (Interest on Lawyers' Accounts) programs, and private donations.

6. Although Congress has never before prohibited recipients from using public non-LSC funds—such as grants from state and local entities and IOLA funds—to engage in prohibited activities, Congress had previously extended some of the restrictions to activities funded with *private* do-

nations. 42 U.S.C. § 2996i(c); 45 C.F.R. pts. 1610, 1627 (1995). Despite this curious dichotomy, plaintiffs do not challenge the restrictions on private funds, contending that those prior restrictions on the use of private funds were insignificant since public funds constitute the "overwhelming majority" of recipients' non-LSC funds. Memorandum of Law In Support of Motion for Preliminary Injunction at 3 n. 2. Therefore, the Court's reference herein to "non-LSC" funds refers to *public* non-LSC funds.

the LSC] may be used to provide financial assistance to any [recipient]" that engages in any of the prohibited activities. Act § 504(a). Furthermore, the new statute states that recipients are free to "us[e] funds received from a source other than the Legal Services Corporation to provide legal assistance ... except that such funds may not be expended by recipients for any purpose prohibited by this Act ...." Act § 504(d)(2)(B).

Plaintiffs' amended complaint challenges the constitutionality of the following prohibited activities set forth in the Act: [7]

None of the funds appropriated in this Act to the Legal Services Corporation may be used to provide financial assistance to any [recipient]:

(2) that attempts to influence the issuance, amendment, or revocation of any executive order, regulation, or other statement of general applicability and future effect by any Federal, State, or local agency [hereinafter "executive order provision"];

(3) that attempts to influence any part of any adjudicatory proceeding of any Federal, State, or local agency if such part of the proceeding is designed for the formulation or modification of any agency policy of general applicability and future effect [hereinafter "agency provision"];

(4) that attempts to influence the passage or defeat of any legislation, constitutional amendment, referendum, initiative, or any similar procedure of the Congress or a State or local legislative body [hereinafter "legislation provision"] [subsections (2), (3), and (4) will be referred to collectively as the "lobbying provisions"];

(5) that attempts to influence the conduct of oversight proceedings of the [LSC] or any person or entity receiving financial assistance provided by the Corporation [hereinafter "LSC oversight provision"];

(7) that initiates or participates in a class action suit [hereinafter "class action provision"];

(11) that provides legal assistance for or on behalf of [certain] alien[s% [hereinafter "aliens provision"]; [8]

(12) that supports or conducts a training program for the purpose of advocating a particular public policy or encouraging a political activity, a labor or antilabor activity, a boycott, picketing, a strike, or a demonstration ... [hereinafter "training provision"];

(13) that claims (or whose employee claims), or collects and retains, attorneys' fees pursuant to any Federal or State law permitting or requiring the awarding of such fees [hereinafter "attorneys' fees provision"];

(15) that participates in any litigation on behalf of a person incarcerated in a Federal, State, or local prison [hereinafter "incarcerated client provision"];

(16) that initiates legal representation or participates in any other way ... involving an effort to reform a Federal or State welfare system ... [hereinafter "welfare reform provision"];

(18) unless such person or entity agrees that [it] will not accept employment resulting from in-person unsolicited advice to a nonattorney that such nonattorney should obtain counsel or take legal action ... [.] [hereinafter "solicitation provision"] ....

Act §§ 504(a)(2)-(5), (7), (11)-(13), (15)-(16), (18).

## II. Evolution of Regulations Establishing Program Integrity Requirements Governing Alternative Channels for Engaging in Prohibited Activities

### A. The Nature of the Regulations at the Time of *LASH I*

It is well-settled that the LSC has the power to promulgate rules and regulations to implement the Act. *See* Act § 503(b) ("the [LSC] shall promulgate regulations to implement a competitive selection process for the recipients"); 42 U.S.C. § 2996g(e) (requiring the LSC to publish in the Federal Register "all its rules, regulations, guidelines, and in-

---

7. Some of the restrictions are new; some were contained in prior statutes, such as lobbying. Act § 504(a)(2)-(4); 42 U.S.C. § 2996f(a)(5).

8. The Act sets forth a series of exceptions, such as lawfully admitted aliens who are permanent residents. *See* Act § 504(a)(11)(A)-(F).

structions"). Although the LSC was established as a federally-chartered nonprofit corporation of the District of Columbia rather than as an agency, Congress has manifested its intent to treat the LSC as a federal agency for regulatory purposes. *See Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.,* 940 F.2d 685, 690–91 (D.C.Cir.1991) ("We conclude that the Act clearly grants both general and specific rulemaking powers to [the] LSC ...."). In light of the fact that the Act's restrictions now apply to non-LSC funds, the LSC recognized in the preamble to the first set of regulations passed after the Act that new regulations were necessary:

> [These regulations] incorporate[% the restrictions imposed by the [Act], which apply to both a recipient's LSC funds and its non-LSC funds. Past appropriations acts have applied restrictions contained in those acts only to the funds appropriated thereunder. In contrast, the [Act] prohibits LSC from funding any recipient that engages in certain specified activities or that fails to act in a manner consistent with certain [of the Act's] requirements.

61 Fed.Reg. 41,960, 41,960 (Aug. 13, 1996). Central to the regulations was the section providing that "[a] recipient may not use non-LSC funds for any purpose prohibited by the LSC Act or for any activity prohibited by or inconsistent with section 504 ...." 45 C.F.R. § 1610.3 (1996).

On December 2, 1996, the LSC promulgated a revised set of regulations, 61 Fed.Reg. 63,749, which included a new regulation entitled "Transfers of recipient funds." It provided that when a recipient transferred any funds, whether from LSC or non-LSC sources, the prohibitions on use of the funds would continue to apply to those transferred funds. 45 C.F.R. § 1610.7 (1996). Comments accompanying the revised regulations

explained that applying the restrictions to transferred non-LSC funds was necessary "because otherwise recipients would be able to avoid the conditions on their non-LSC funds by simply transferring the funds." 61 Fed.Reg. 63,749, 63,752 (1996).

These new and revised regulations left in place a long-standing LSC regulation entitled "Interrelated Organizations," 50 Fed. Reg. 49,276, 49,279 (Nov. 29, 1985), which addressed the circumstances under which another organization would be deemed "controlled" by a recipient. The interrelated organizations regulation stated that "[f]unds held by an organization which ... is controlled by ... a recipient ... are subject to the same restrictions as if the funds were held by the recipient." *Id.* at 49,279–80. The regulation posited eight non-exclusive factors to be weighed to determine whether control exists.[9] The Act's extension of restrictions to non-LSC funds placed heightened importance on the interrelated organizations policy since non-LSC funds of any organization that was "controlled" by a recipient were subject to all of the Act's statutory restrictions.

## B. The Decision in *LASH I*

This Court is not the first federal forum to pass on the constitutionality of the Act as implemented by LSC regulations. On February 14, 1997, a federal district court for the District of Hawaii issued an order granting in part and denying in part the plaintiffs' request for preliminary injunctive relief. *Legal Aid Society of Hawaii, et al. v. Legal Servs. Corp.,* 961 F.Supp. 1402 (D.Haw.1997) (Kay, J.) (hereinafter referred to as "*LASH I*").

The *LASH I* court resolved the preliminary injunction issue through a two-part analysis. First, the court determined the

---

**9.** These factors were: "(a) Extent and pattern of any overlap of officers, directors, or other managers among organizations; (b) Contractual and financial relationships; (c) History of relationships among the organizations; (d) Close identity of interest; (e) One organization has become a mere conduit, 'incorporated pocketbook,' or 'straw' party for another whether or not there was an attempt to work an injustice or promote a fraud; (f) Funds are solicited by a separate entity in the name of and with the expressed or implicit approval of the recipient ...; (g) A recipient transfers resources to another entity that holds these resources for the benefit of the recipient; and, (h) A recipient assigns functions to an entity whose funding is primarily derived from sources other than public contributions." Audit and Accounting Guide for Recipients and Auditors § 1–7, 50 Fed.Reg. 49,276, 49,279 (1985).

threshold issue of which of the challenged restrictions implicated constitutional rights, since the *"sine qua non* of [prevailing on a claim of infringement on constitutional rights] is proving that the restrictions at least implicate Plaintiffs' constitutional rights." *LASH I*, 961 F.Supp. at 1408. The court then considered whether the restrictions implicating constitutional rights actually amounted to constitutional violations. *Id.* at 1411. The parties before this Court agree that the two-part framework adopted by the *LASH I* court was appropriate. *See* Pl. Supp. Mem. of Law at 3; Def. Supp. Mem. of Law at 1 n. 2. The court in *LASH I* concluded that plaintiffs had a probability of success on the merits in respect to all but three of the restrictions, which it determined did not implicate constitutional rights.

In the first phase of its analysis, the *LASH I* court examined the "laundry list" of constitutional rights plaintiffs argued were implicated by the Act's restrictions. 961 F.Supp. at 1402. The court concluded that First Amendment rights to lobby, to associate, and to meaningful court access were implicated by all but three of the challenged restrictions. Specifically, the right to lobby was implicated by the executive order provision, the agency provision, the legislation provision, and the welfare reform provision, *id.* at 1408 (Act § 504(a)(2)-(4), (16));[10] the rights of association and to meaningful court access were implicated by the training provision and the incarcerated client provision. *Id.* at 1409–10 (Act § 504(a)(12), (15)).[11]

The *LASH I* court concluded, however, that the aliens, class action, and attorneys' fees provisions did not implicate constitutional rights. The aliens provision did not implicate such rights because "[i]f Congress in its near plenary power over aliens decides that legal aid associations and their lawyers should not represent them, that decision should not be disturbed." *Id.* at 1410. As

for the class actions provision, the *LASH I* court concluded that adopting plaintiffs' position would in effect constitutionalize Rule 23 of the Federal Rules of Civil Procedure, which it found "imprudent ... absent any appellate precedent." *Id.* Finally, in respect to the attorneys' fees provision, the *LASH I* court concluded that "[p]laintiffs do not cite any authority that fee-shifting provisions violate Due Process or implicate the First Amendment," and that "because the provision does not implicate a suspect class, under Equal Protection the restriction need only pass rational basis which it clearly does." *Id.* at 1411.

Having found that all but three of the challenged restrictions implicated constitutional rights, the *LASH I* court proceeded to determine whether those restrictions, as implemented by LSC regulations, "not only implicate the First Amendment but whether they also impinge the First Amendment." *Id.* The court's analysis of the constitutional issue focused on the regulations promulgated by the LSC rather than the restrictions, since those regulations affected the ability of recipients to engage in activities prohibited by the Act through affiliate organizations. The court stated that "the dispositive factor ... is whether the restrictions [leave] open adequate channels for speech.... [T]herefore, the Plaintiffs' likelihood of success rests on their ability to prove that the LSC restrictions prevent the organizations and lawyers from voicing their un-subsidized opinions." *Id.* at 1414.

The *LASH I* court examined the trilogy of leading Supreme Court cases on unconstitutional conditions—*Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991); *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984); and *Regan v. Taxation with Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129

---

**10.** The *LASH I* court also concluded that a restriction on participation in reapportionment cases implicated the right to lobby. *Id.* (Act § 504(a)(1)). Plaintiffs in this case have not challenged that provision. The Court also notes that, although apparently not challenged in *LASH I*, the LSC oversight provision, Act § 504(a)(5), also implicates the right to lobby for the same reasons as those articulated by *LASH I.*

**11.** The *LASH I* court also determined that rights to meaningful court access and to associate were implicated by the restriction, not challenged by plaintiffs in this case, on representation of persons allegedly involved in illegal drug activity in public housing eviction proceedings. *Id.* (Act § 504(a)(17)).

(1983)—and focused its analysis on a comparison between the LSC regulations and the regulations upheld by the Supreme Court in *Rust*. The *Rust* case originated from the enactment in 1970 of Title X to the Public Health Service Act, "which provides federal funding for family-planning services." 500 U.S. at 178, 111 S.Ct. at 1764. The regulations at issue in *Rust* ("*Rust* regulations") were promulgated in 1988 pursuant to a provision requiring that " '[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning.' " *Id.* (quoting 42 U.S.C. § 300a–6).[12] The Supreme Court noted "three principal conditions on the grant of federal funds for Title X projects" created by the regulations: "[(1)] a Title X project may not provide counseling concerning the use of abortion as a method of family planning ... [(2)] a Title X project [may not] engag[e] in activities that encourage, promote or advocate abortion as a method of family planning ... [and (3)] Title X projects [must] be organized so that they are physically and financially separate from prohibited abortion activities." *Id.* at 179–80, 111 S.Ct. at 1764–65 (internal quotations omitted).

Although the plaintiffs in *Rust* raised several grounds for their challenge to the Title X regulations, most pertinent to the present case is the *Rust* Court's disposition of the claim that the Title X regulations were impermissible "because they condition the receipt of a benefit ... on the relinquishment of a constitutional right." *Rust*, 500 U.S. at 196, 111 S.Ct. at 1773. The Supreme Court summarized the unconstitutional conditions doctrine as follows:

> [O]ur "unconstitutional conditions" cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program.

*Id.* at 197, 111 S.Ct. at 1774. The Court upheld the regulations on Title X projects because the regulations "do not force the Title X grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from Title X activities." *Id.* at 196, 111 S.Ct. at 1773.

The Title X regulations governing the separateness of projects engaging in restricted activities, referred to as "program integrity" requirements, mandated that to conduct prohibited abortion counseling, the grantee had to maintain separate facilities, personnel, and records for the prohibited activity. The Government defended the program integrity requirements on the grounds that "they are necessary to assure that Title X grantees apply federal funds only to federally authorized purposes and that grantees avoid creating the appearance that the Government is supporting abortion-related activities." *Id.* at 188, 111 S.Ct. at 1769.

Ultimately, the *Rust* Court rejected the unconstitutional condition claim since:

> By requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has ... not denied it the right to engage in abortion-related activities. Congress has merely refused to fund such activities out of the public fisc, and the [agency] has simply required a certain degree of separation from the Title X project in order to ensure the integrity of the federally funded program.

*Id.* at 198, 111 S.Ct. at 1774.

The *LASH I* court therefore framed the issue as follows: "The more difficult question (and the more contested between the parties) consists of what side of the continuum this case falls with regard to *Rust*." *LASH I*, 961 F.Supp. at 1415. Ultimately, the *LASH I* court determined that the LSC regulations were less flexible and more burdensome than the *Rust* regulations, concluding that "the LSC regulations fall on the unconstitutional

---

12. As noted, the statute at issue in the present case provides, in almost identical language, that: "None of the funds appropriated in this Act to the Legal Services Corporation may be used to provide financial assistance to any recipient that [engages in the prohibited activities]." Act § 504(a).

side of *Rust*," and accordingly found that the plaintiffs were likely to prevail on the merits. *Id.* at 1416.

Of particular importance to the *LASH I* court was the combination of the expansion of the restrictions with the LSC's long-standing interrelated organizations policy. The court noted that in light of the expansiveness of the factors used to determine whether a recipient "controls" an organization, which made likely a finding of control between a recipient and any other organization in a relationship with the recipient, "the LSC regulations cannot be said to be more liberal than those in *Rust.*" *Id.* In other words, "the *Rust* regulations appear far more expansive in allowing an organization to pursue" its involvement in prohibited activities through other organizations. *Id.* In its probability of success on the merits inquiry, therefore, the *LASH I* court concluded that the LSC regulations were most analogous to those in *League of Women Voters,* the only case in the unconstitutional conditions doctrine trilogy that held that adequate alternative channels were not available for the expression of First Amendment rights. *Id.*

## C. The Interim Regulations Promulgated Subsequent to *LASH I*

On January 27, 1997, little more than two weeks prior to the *LASH I* decision, plaintiffs in this Court filed their amended complaint, attacking the same set of restrictions at issue in *LASH I.* In the aftermath of the *LASH I* court's holding that the challenged regulations fell on the unconstitutional side of *Rust,* on March 14, 1997 the LSC promulgated new, interim regulations which were "intended to address constitutional challenges raised by the previous rule." 62 Fed.Reg. 12,101 (1997) ("interim regulations"). Although issued after plaintiffs' amended complaint, the interim regulations were in place

at the time of the preliminary injunction Hearing.[13] Counsel for defendant-intervenor United States conceded at the Hearing that passage of the interim regulations was an attempt to cure the constitutional deficiencies found by the *LASH I* court, Tr.[14] at 63, and that the Court should focus its attention on the constitutionality of the new regulations. Tr. at 4 ("the playing field really has narrowed ... what we're really debating about are whether or not the program integrity requirements and the new regulations are constitutional in light of *Rust* "); *see also* 62 Fed.Reg. 12,101, 12,101 ("limited adjustments" are intended to "respond to the constitutional concerns addressed by the [*LASH I* ] Court"). Plaintiffs' counsel also conceded at the Hearing that the battle ground had really shifted to the new regulations. Tr. at 36–37 ("I don't believe it's impossible to develop a set of regulations that would permit the Government to advance the only interest that it has here.").

The interim regulations made two critical changes to the regulations in existence at the time *LASH I* was decided. First, the transfer of funds provision was revised so that transfer by a recipient of non-LSC funds would not be burdened by the statutory prohibitions. 45 C.F.R. § 1610.7. However, the LSC added a new section entitled "Program integrity of recipient." 45 C.F.R. § 1610.8. As conceded by counsel for LSC and counsel for the United States at the Hearing, the program integrity requirements were carefully patterned after those approved in *Rust.* *See* Tr. at 51 ("These are exactly the same kinds of regulations from *Rust* .... In fact, the language of them is exactly the same.") (statement by counsel for LSC); Tr. at 63 ("The folks at LSC sat down and they promulgated regulations. They asked themselves how to do it, and what they did is they looked at what the Supreme Court said in

---

**13.** At the Hearing, counsel for plaintiffs argued that the *LASH I* court's analytical framework and legal conclusions were correct, with the exception of the court's holdings that three of the restrictions did not implicate plaintiffs' constitutional rights. Thus, a holding by this Court at that posture of the litigation that the interim regulations were constitutionally impermissible would have required the Court to examine those three disputed provisions. On the other hand, a

determination that the regulations were sufficient to protect plaintiffs' constitutional rights would render academic the issue of which of the Act's restrictions implicated the constitution in the first instance.

**14.** "Tr." refers to the transcript of the preliminary injunction Hearing.

*Rust* and they did their level best to copy from *Rust*.") (statement by counsel for United States).

Program integrity requirements regulate the ability of recipients to maintain a relationship with organizations, often referred to as "affiliates," that do not receive any LSC funds and engage in activities prohibited by the Act. Unlike organizations "controlled" by recipients, which are deemed to be LSC actors, affiliates can maintain a relationship with a recipient yet engage in prohibited activities. As in *Rust,* the use of affiliates under the interim regulations was intended to strike a balance between providing an outlet to engage in advocacy prohibited by the Act and maintaining the integrity of the Act by ensuring that no LSC funds would be used to subsidize prohibited activities in violation of congressional intent. The program integrity requirements section of the interim regulations reads, in pertinent part:

> [The Act's restrictions will not be applied to an affiliate if it] is physically and financially separate from the organization. Mere bookkeeping separation of LSC funds from other funds is not sufficient. In order to be physically and financially separate, the recipient and the [affiliate] must have an objective integrity and independence from one another. Factors considered to determine whether such objective integrity and independence exist shall include, but are not limited to:
>
> (i) The existence of separate personnel;
>
> (ii) The existence of separate accounting and timekeeping records;
>
> (iii) The existence of separate facilities; and
>
> (iv) The extent to which signs and other forms of identification which distinguish the recipient from the [affiliate] are present.

45 C.F.R. § 1610.8(b)(3).

Although based on the *Rust* program integrity requirements, the interim regulations did not exactly mirror those requirements. Several differences between them are noteworthy because they formed the basis of plaintiffs' position at the time of the Hearing that the program integrity requirements were unconstitutional in part because they were more restrictive than the *Rust* program integrity regulations.

First, in addition to the program integrity requirements, a separate section in the interim regulations perpetuated the LSC's former "interrelated organizations" policy. The regulation provided in that regard:

> If a recipient controls, is controlled by or is subject to common control with another organization, the two organizations are interrelated organizations and the restrictions in this part will be applied to both organizations, unless the association between the two organizations meets the standards of program integrity in paragraph (b) of this section.

45 C.F.R. § 1610.8(a). This provision formally replaced the LSC's prior "interrelated organizations" regulation. 62 Fed.Reg. 12,-101, 12,101 (1997). Under this new provision, therefore, an organization could be "controlled" by a recipient yet engage in prohibited activities so long as the program integrity requirements were satisfied. Despite this exception, no provision regarding control appeared in *Rust*'s program integrity requirements, and plaintiffs argued that this provision contributed to the regulation's constitutional infirmity. *See* Plaintiffs' Reply Memorandum at 8–9.

The second difference between the interim and *Rust* program integrity requirements concerns one of the four factors used in the program integrity analysis—namely, the separateness of the recipient's and affiliate's facilities. In *Rust,* the regulation stated that the "degree of separation" of facilities would be considered, whereas the interim regulation required the "existence" of separate facilities. Plaintiffs argued that "[t]his difference appears to be more than semantics," *id.* at 10, and that "[u]nlike the [*Rust* regulation], which measured the *degree* of separation, the LSC rule focuses on the *existence* of separate facilities." *Id.*

Third, the *Rust* program integrity requirements stated that the determination of whether a recipient and affiliate were suffi-

ciently separate would be based on all "facts and circumstances," whereas the interim regulations made no such statement, which arguably implied that in order to show objective integrity, a recipient would have to satisfy each and every program integrity factor. Plaintiffs emphasized that unlike the *Rust* program integrity requirements, which "made it clear that [each of the four considerations] was only one factor in the assessment of program integrity," the interim regulations appeared to establish a *"per se* test." *Id.* Based on all these differences between the interim regulations and the *Rust* program integrity requirements, plaintiffs concluded that the LSC restrictions on the use of affiliates "go[] far beyond the simple segregation requirements of *Rust." Id.* at 12.

The Court asked plaintiffs' counsel at the Hearing whether it might be provident to withhold judgment until the final regulations were promulgated, commenting:

> [T]hese are interim regulations. Is there not some wisdom in allowing some period of time to let the dust settle until we get final regulations? They may come in a different form two months from now or three months from now. You may have to come back to this or another court to deal with a whole different spate of regulations.

Tr. at 8. The colloquy continued as follows:

> [PLAINTIFFS]: If there's any change, we'll let you know immediately, but I should say, I don't anticipate that there will be a significant change. We think that these are the regulations that we're going to be operating on into the foreseeable future.
>
> THE COURT: You know, there were a spate of new regulations after Judge Kay [in *LASH I* ] spoke. Maybe after we have this argument today, there will be more regulations.

Tr. at 10. At the conclusion of the Hearing, the Court, noting the responsiveness of the rulemaking process to the *LASH* litigation, commented:

> Maybe as a result of this opportunity for all of us to discuss these issues, there can be some further way in which these matters can be addressed, or there will

be an ongoing dialogue between people of good will and good spirit in our great profession. If [this Hearing] has possibly facilitated that possibility, I feel that's also a purpose to be served from my end of the spectrum . . . .

Tr. at 68.

### D. The Final Program Integrity Requirements

On May 21, 1997, the LSC replaced the interim regulations with what it termed the "Final rule," which made revisions to the interim rule "[b]ased on [comments received by the LSC] and its own internal research and review." 62 Fed.Reg. 27,695, 27,695 (May 21, 1997) ("final regulations"). The Court therefore will treat plaintiffs' motion as directed at the final regulations rather than the regulations analyzed in *LASH I* or the interim regulations issued shortly after *LASH I* and in effect at the time of the Hearing. In particular, the Court focuses on the revised program integrity requirements, which plaintiffs contend are still overly restrictive in a manner which renders them facially unconstitutional.

The program integrity section of the final regulations provides as follows:

(a) A recipient must have objective integrity and independence from any organization that engages in restricted activities. A recipient will be found to have objective integrity and independence from such an organization if:

(1) The other organization is a legally separate entity ["separate entity requirement"];

(2) The other organization receives no transfer of LSC funds, and LSC funds do not subsidize restricted activities ["no subsidy requirement"]; and

(3) The recipient is physically and financially separate from the other organization. Mere bookkeeping separation of LSC funds from other funds is not sufficient. Whether sufficient physical and financial separation exists will be determined on a case-by-case basis and will be based on the totality of the facts. The presence or absence of any one or

more factors will not be determinative. Factors relevant to this determination shall include but will not be limited to:

(i) The existence of separate personnel;

(ii) The existence of separate accounting and timekeeping records;

(iii) The degree of separation from facilities in which restricted activities occur, and the extent of such restricted activities; and

(iv) The extent to which signs and other forms of identification which distinguish the recipient from the organization are present [collectively the "separation factors"].

45 C.F.R. § 1610.8(a). Significantly, subsection (b) of § 1610.8 provides that recipients must certify to the LSC their compliance with the program integrity requirements.

The revised program integrity section eliminates virtually every difference between the interim regulations and the *Rust* regulations in respect to program integrity requirements. First, the final requirements deleted the provision regarding control of an affiliate by a recipient. The LSC removed the provision because "the [LSC] determined that if a program is found to be in compliance with the [remainder of the] program integrity test, there would be a sufficiently separate identity and operational independence from the recipient." 62 Fed.Reg. 27695, 27697.

The final regulations made two further changes intended to bring the program integrity requirements exactly in line with *Rust*. First, the separate facilities factor was changed from "the existence of separate facilities" to "the degree of separation from facilities in which restricted activities occur." And second, the LSC added language to emphasize that there is no *per se* rule in respect to the factors relevant to the program integrity determination. In fact, the new language is even less restrictive than the *Rust* regulation since it states that "[t]he presence or absence of any one or more factors will not be determinative."

The Court notes that, despite the similarity between the program integrity requirements in *Rust* and the LSC's final regulations, the *Rust* regulations placed further restrictions on federally-funded family planning projects which have no counterpart in the LSC regulations. First, the *Rust* regulations limited the content of a doctor's advice to the project's client; specifically, Title X doctors were forbidden from advising women regarding abortion. *Rust*, 500 U.S. at 179, 111 S.Ct. at 1764 (citing 42 C.F.R. § 59.8(a)(1) (1989)). Second, doctors were absolutely prohibited from referring clients to a project which performed abortions, which included any affiliate of the project. *Id.* at 179–80, 111 S.Ct. at 1764–65 (citing 42 C.F.R. § 59.8(a)(2)). And third, doctors were banned from even explaining to the patient that the content of the advice given was being curtailed by an administrative rule. *Id.* at 180, 111 S.Ct. at 1765 (citing 42 C.F.R. § 59.8(b)(5)).

Notably, although the LSC chose to incorporate the program integrity requirements from *Rust* into the final regulations, it did not carry over from *Rust* any specific restrictions on: (1) counseling the client; (2) referring the client to another group, such as the recipient's affiliate; and (3) explaining to the client that it cannot perform the prohibited activity because it is barred by LSC regulation. Since the Act itself does not state whether the prohibited activities, most of which are actions taken outside of the recipient's office, are intended to encompass legal advice, referral to affiliates, and explanation about the Act, the Court interprets the LSC's decision not to carry over these additional restrictions from the *Rust* regulations as an implicit approval of these three activities. Counsel for the LSC recognized this interpretation as the LSC's position in a letter to the Court:

[In contrast to *Rust* ], the statutory restrictions at issue here (as implemented by LSC's regulations) do not prevent LSC-subsidized lawyers from fully advising their clients of their legal rights and practical options; indeed, the restrictions do not inhibit lawyers' *speech* to their clients at all. For example, an LSC lawyer is free to advise potential clients that their case is best suited for class action treatment, or that they may have a claim that a welfare law is unconstitutional. The law-

yer is also permitted to advise potential clients that while the LSC-funded entity cannot take the case, the lawyer knows of other attorneys who can. Therefore, unlike the women in *Rust,* who received "skewed" information, the clients of LSC-subsidized lawyers receive complete information.

Letter to the Court from Alan Levine, dated March 31, 1997 at 2.

### III. *LASH II*

Following the issuance of the final program integrity requirements, the LSC moved for summary judgment in the Hawaii court, contending that the final revisions made by the LSC brought the regulations into complete conformity with the *Rust* program integrity requirements, thereby compelling a determination that the final program integrity requirements were no more burdensome on plaintiffs' constitutional rights than those at issue in *Rust.* The Hawaii court agreed. In an Order dated August 1, 1997, the court dissolved the previously entered preliminary injunction as moot, and granted LSC's motion. *Legal Aid Society of Hawaii, et al. v. Legal Servs. Corp.,* 981 F.Supp. 1288 (D.Haw.1997) ("*LASH II* ").

The *LASH II* court began its analysis by noting that the LSC regulations on interrelated organizations had been substantially modified by the interim and final regulations, and that the issue in the case had therefore been reduced to the following:

> [D]oes a legal aid organization's ability to control a separate legal organization with separate personnel and facilities provide an alternative channel for the exercise of the first legal aid organization's constitutional rights as required by the unconstitutional conditions doctrine.

*Id.* at 1292. The *LASH II* court summarized its First Amendment holding by emphasizing that the ability of recipients to exercise control over affiliates constituted an adequate alternative channel for exercising their First Amendment rights:

> The Court reads the new regulations as allowing a LSC funded organization to control another organization that engages in restricted activities so long as all the insu-

larity and separate incorporation requirements of the regulations are satisfied. With this ability to control the separately incorporated and insular second organization, the Court finds that alternative channels exist for LSC-funded organizations to exercise their constitutionally protected rights such as lobbying the legislature. Thus, the LSC-funded legal aid societies will be able to control affiliates who care for the needs of the poor in areas from which the regulations restrict the societies.

*LASH II* at 1289.

In reaching this conclusion, the court rejected a number of arguments advanced by the plaintiffs in their effort to distinguish *Rust.* First, in respect to the insularity requirements, the court rejected plaintiffs' contention that *Rust* only upheld requirements beyond mere bookkeeping separation because it is more difficult for doctors than lawyers to account for their time. The court held that "[i]t is no more difficult for a doctor to categorize his conversation with a patient than it is for a lawyer to do so with his client." *Id.* at 1292.

The court then summarily rejected the argument that *Rust* was distinguishable because the Act was not intended to convey a Government message, stating that "Congress does not control the analysis and advice of either a Title X doctor or a LSC lawyer except for prohibiting advice in certain areas such as abortion." *Id.* at 1292. The court then considered the claim that since litigation, unlike communication in a doctor's office, is a traditional sphere of expression, *Rust* cannot control. The court noted that, even assuming litigation was a traditional sphere of expression, restrictions on those forms of expression are not *per se* unconstitutional; rather, such expression is subject to First Amendment vagueness and overbreadth doctrines. The court did not address the issues of overbreadth or vagueness since it determined that plaintiffs "have not alleged that the restrictions are vague or overbroad." *Id.*

The *LASH II* court then noted that the final program integrity requirements were more restrictive than the *Rust* regulations

insofar as the affiliate of LSC recipients had to be separately incorporated. This difference, the court determined, was insubstantial in light of the approbation given to such a requirement by the Supreme Court in *Regan v. Taxation with Representation,* 461 U.S. 540, 544 n. 6, 103 S.Ct. 1997, 2000 n. 6, 76 L.Ed.2d 129 (1983) (noting that such a requirement is not "unduly burdensome"). The court thus concluded that "[t]he requirement of separate incorporation does not in any significant way add to Plaintiffs' burdens." 981 F.Supp. at 1296.

Finally, the *LASH II* court dismissed plaintiffs' due process and equal protection arguments. The due process claims were rejected primarily on the ground that, as dictated by *Rust,* "Congress' refusal to fund the restricted activities here leaves the indigent clients with the same choices they would have had absent the creation of the LSC." *Id.* at 1298. The court therefore concluded that "the regulations cannot be deemed to 'impermissibly burden' whatever Due Process rights the client may have." *Id.* The court also emphasized that the "ample alternative channels" provided by the regulations significantly diminished the impact of the restrictions on indigent clients. *Id.* at 1300. Turning to the equal protection claims, the *LASH II* court rejected these contentions for two reasons. First, since poverty is not a suspect classification, any discrimination against the poor need only have a rational basis to survive an equal protection challenge. The court had no trouble finding that the regulations passed the rational basis level of scrutiny. *Id.* And second, the court dispelled the notion that the equal protection clause was violated because of "discriminatory distribution of fundamental rights," noting the "long line of cases holding that the government need not fund the exercise of a fundamental right." *Id.* (citing *Harris v. McRae,* 448 U.S. 297, 315, 100 S.Ct. 2671, 2687, 65 L.Ed.2d 784 (1980)).

## ISSUES CURRENTLY BEFORE THE COURT

Although there have been no submissions by the parties addressing *LASH II,* based upon prior submissions to the Court plaintiffs presumably would not concur in *LASH II*'s approbation of the final regulations, except in respect to the separate incorporation requirement, which they do not contest. Plaintiffs' contentions embrace the arguments made by the plaintiffs in *LASH II,* but are in a number of respects more expansive. As best the Court can glean from the memoranda of law, oral argument, and a number of post-Hearing letters submitted both before and after the adoption of the final regulations, the following issues are fairly presented to the Court in the context of plaintiffs' preliminary injunction application: (1) can the LSC lawfully adopt regulations to guard against the appearance that the Government endorses the prohibited activities; (2) if so, are the regulations enacted by the LSC, specifically the "separate personnel" and "degree of separate facilities" program integrity requirements, properly drawn to address that interest considering the differences, such as they are, between the Title X proscriptions in *Rust* and the impact in this case on the legal profession and the attorney-client relationship; and (3) do any of the restrictions or regulations violate the Due Process or Equal Protection clause of the Fifth Amendment?

## DISCUSSION

### I. Preliminary Injunction Standard

Generally, in order to obtain preliminary injunctive relief, a plaintiff must show "a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party." *Time Warner Cable v. Bloomberg L.P* ., 118 F.3d 917, 923 (2d Cir.1997). However, when a plaintiff seeks to enjoin "'governmental action taken in the public interest pursuant to a statutory or regulatory scheme,'" plaintiffs must meet the stricter "probability of success" standard. *Id.* (quoting *Plaza Health Lab., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)); *see also Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir. 1996) (When seeking to enjoin such governmental action, plaintiffs "cannot resort to the

'fair ground for litigation' standard."). Plaintiffs recognize that, since they seek to enjoin the LSC's enforcement of regulations issued pursuant to a statutory scheme, they must demonstrate a probability of success on the merits. Memorandum of Law in Support of Motion For Preliminary Injunction at 6.

Since the parties all appropriately agree that the final regulations implicate plaintiffs' First Amendment rights, the key inquiry is whether they go so far as to actually violate those rights. The Court recognizes that, if plaintiffs' First Amendment rights are violated, then they almost certainly have established irreparable harm. *See Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitute irreparable injury.").

## II. Permissibility of the Final Regulations

All parties agree that as a consequence of enactment of the subject regulations after the commencement of plaintiffs' lawsuit challenging the constitutionality of the Act, the focus of this litigation has essentially shifted. Indeed, plaintiffs acknowledge that the Court's principal inquiry is to now determine whether the regulations constitutionally "provide a meaningful opportunity for LSC recipients to engage in restricted activities using non-LSC funds." Plaintiffs' Reply Memorandum at 2. However, before turning to the constitutionality of the Act as implemented by the final regulations, the Court must determine the threshold issue of whether those regulations constitute a *permissible* construction of the Act by the LSC. *See Rust,* 500 U.S. at 183–87, 111 S.Ct. at 1766–68. This requires an analysis of whether the final regulations are consistent with the Act's language and congressional intent. *Id.*

Plaintiffs contend that the program integrity requirements are not a permissible construction of the Act because they require more than "maintain[ing] accurate time and expense records distinguishing restricted from unrestricted activities ... so that LSC could verify that federal funds were not spent on restricted activities." Plaintiffs'

Supplemental Memorandum of Law at 6. From the plaintiffs' perspective, the only permissible regulation the LSC can implement to ensure separation between the recipient and affiliate is the imposition of such "bookkeeping" requirements.

■ The Court's permissibility analysis is guided by the broad-based principle of administrative law that when reviewing an agency's construction of a statute which does not "directly [speak] to the precise question at issue," the court must bear in mind that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Moreover, "[i]n determining whether a construction is permissible, '[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.'" *Rust,* 500 U.S. at 184, 111 S.Ct. at 1767 (quoting *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2781 n. 11). Furthermore, the Court notes that the United States Court of Appeals for the District of Columbia Circuit has held that LSC regulations are entitled to full *Chevron* deference. *See Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.,* 940 F.2d 685, 689–90 (D.C.Cir. 1991) ("We conclude that the basic principles of *Chevron* apply to the statutory scheme created by the Act and the role contemplated for LSC under it .").

*Chevron*'s canon of deference to agency interpretations is applicable to this case because nothing in the Act speaks to the precise question of how, or even whether, program integrity requirements can be maintained. *See Rust,* 500 U.S. at 184, 111 S.Ct. at 1767 (the statute "does not speak directly to the issue[] of ... program integrity"). The Act gives no indication as to the steps a recipient must take to separate its LSC-authorized activity from its engagement in prohibited activity funded by non-LSC sources. The Court therefore turns to the question of whether the LSC's

interpretation of the Act is consistent with the Act's language and underlying intent.

■ The Court rejects plaintiffs' proposed construction of the Act because it would undermine the Act's attempt to achieve a significant measure of separation between recipients and the prohibited activities. The Government interest underlying the Act is broader than just preventing the subsidization of prohibited activities with federal funds—indeed, if that were the case, there would be no need to restrict the use of *non*-LSC funds at all. Rather, the Act reveals an additional interest—preventing the *appearance* of Government endorsement of the prohibited activities.

Congress' intent to prevent the appearance of endorsement through passage of the Act is supported by two facts. First, the difference between the wording of the Act and its predecessors reflects Congress' intent to move beyond recipients' prior practice of using nothing more than accounting procedures to document compliance with the statutory proscriptions on using federal funds for prohibited activities. Specifically, the pre-Act statutory language focused on the subsidization interest by providing that "[n]o funds made available by [LSC] may be used" for any of the prohibited activities, 42 U.S.C. § 2996f(b), whereas the Act states that "[n]one of the funds appropriated [by the LSC] may be used to provide financial assistance to any [recipient]" that engages in any of the prohibited activities. Act § 504(a). This broader language evinces an intent to distance recipients of any LSC funds from all of the prohibited activities rather than merely tracing the path of federal funds.

The second indication of this intent is contained in the Senate Report which accompanied the Act when it was reported out of the Committee on Labor and Human Resources:

[The Act] also bans LSC attorneys from using nonfederal funds for any purpose prohibited by the LSC Act, as amended. There are two important justifications for this restriction. First, many legal services grantees currently receive funds from both public and private sources. Since the money is basically fungible, it would be difficult if not impossible to place restrictions only on the Federal funds. Second, the public cannot differentiate between LSC advocacy subsidized with public versus private funds. As a result, the public grows weary of watching LSC attorneys lobby legislators—even if that dismay might sometimes be misplaced.

S.Rep. No. 104–392, at 6 (1996). That the LSC shares this view of the Government interests at stake is confirmed by the preamble to the interim regulations:

[The program integrity requirements] are necessary to ensure that there is no identification of the recipient with restricted activities and that the [affiliate] is not a sham or paper organization and is not so closely identified with the recipient that there might be confusion or misunderstanding about the recipient's involvement with or endorsement of prohibited activities.

62 Fed.Reg. 12101, 12102. Under the plaintiffs' interpretation, the Act would have no practical impact on the day-to-day operations of recipient organizations. Recipient organizations could simply continue to use non-LSC funds for prohibited activities, label such as the actions of their "affiliate," and keep accounting records to document this nominal separation. Surely Congress did not intend such a meaningless change in the law.

■ Applying *Chevron* deference to the LSC's interpretation of the Act, the Court concludes that the final regulations are consistent with the Act's language and intent, and therefore constitute a permissible construction of the Act. The Court rejects plaintiffs' counter-interpretation as contrary to congressional intent to achieve both a monetary and clearly identifiable separation between recipients and affiliates.

■ It is also apparent that Congress may always lawfully decide to disassociate itself from the appearance of endorsement of activities it chooses not to subsidize. Thus, in *League of Women Voters*, the Supreme Court noted that "the Government certainly has a substantial interest in ensuring that the audiences of noncommercial stations will not be led to think that the broadcaster's editorials reflect the official view of the government." 468 U.S. at 395, 104 S.Ct. at 3125.

Similarly, the Court in *Rust* implicitly gave its approbation to the Government's contention that program integrity requirements "are necessary to assure that Title X grantees ... avoid creating the appearance that the Government is supporting abortion-related activities." 500 U.S. at 188, 111 S.Ct. at 1769.

## III. Constitutionality of the Act as Implemented by the Final Regulations

Plaintiffs contend that the program integrity requirements are not appropriately tailored to the Government's interest in avoiding the appearance of endorsement. They argue, specifically, that the insularity requirements—separate personnel and degree of separate facilities—while embraced by the Court in *Rust*, have no warrant in the context of the lawyer-client relationships and the nature of the prohibited activities in this case. They distinguish *Rust* as follows:

> The Title X regulations applied to a doctor counseling a patient alone in the doctor's office and the prohibition to be effectuated by those regulations was preventing the doctor from counseling abortion, when funded by the Government. In that context, considerations of separate personnel and separation of facilities, and signs and other forms of identification were relevant to making sure that the patient understood that when she was receiving abortion counseling at the same family planning clinic, it was not supported by federal funds.

Letter to the Court from Peter M. Fishbein, dated June 5, 1997.

By contrast, plaintiffs contend that the restricted activities here at issue "are actions to be taken outside the office," namely "in courts, administrative agencies or legislative bodies," and that the appearance that these activities are being carried out with LSC funds can be obviated "simply by requiring that the papers filed or the advocate making the presentation clearly identify that the activity is being carried out by the entity that is not funded by LSC." *Id.*

In addition, plaintiffs attack the final regulations as "vague and unworkable" because "arrangements will be assessed 'on a case-by-case basis' and determinations 'will be based on the totality of the facts.'" Letter to the Court from E. Joshua Rosenkranz, dated May 27, 1997. Accordingly, plaintiffs conclude that the "LSC has created a standardless world in which the only rational judgment a Legal Services program could possibly make is not to enter into an affiliate relationship or, once it did, not tinker with it." They contend that the "LSC can easily draft regulations that provide more guidance to recipients of LSC funds." *Id.*

■ Plaintiffs' arguments cannot carry the day for a number of reasons. Initially, when dealing with an interest that is viewpoint neutral and not aimed at suppressing vital, fundamental constitutional rights, the Government need only show "a 'fit' between the legislature's ends and the means chosen to accomplish these ends ... that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 632, 115 S.Ct. 2371, 2379, 132 L.Ed.2d 541 (1995) (quoting *Board of Trustees v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 3034, 106 L.Ed.2d 388 (1989)); *see also Rust*, 500 U.S. at 195 n. 4, 111 S.Ct. at 1773 n. 4; *City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804–05, 104 S.Ct. 2118, 2128–29, 80 L.Ed.2d 772 (1984); *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). This would appear to be the proper standard to apply when evaluating whether regulations are properly drawn to protect the Government's interest in avoiding the perception of endorsement of programs which it does not subsidize.

■ Moreover, in order to sustain their facial challenge to the final regulations' program integrity requirements, plaintiffs "must demonstrate that the challenged law either 'could never be applied in a valid manner' or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it 'may inhibit the constitutionally protected speech of third parties.'" *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 2232, 101 L.Ed.2d 1 (1988) (quoting *Taxpayers for Vincent*, 466 U.S. at 798, 104 S.Ct. at 2124); *see*

*also Sanitation and Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 992 (2d Cir.1997); *Rust,* 500 U.S. at 183, 111 S.Ct. at 1766 ("A facial challenge . . . is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [the regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid.") (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987)).

██ The Court does not find persuasive plaintiffs' contention that the "separate personnel" and "degree of separate facilities" requirements, each of which are limited to the office environment, are irrelevant to the Government's asserted interest in preventing the appearance of endorsement because the prohibited activities all take place in a courtroom or other forum outside of recipients' offices and that, in any event, a mere disclaimer would be sufficient. Contrary to plaintiffs' assertion, many integral aspects of engaging in prohibited activities take place in the recipients' office, such as: taking depositions, drafting pleadings, and preparing witnesses for trial. It simply cannot be said that potential clients, opposing attorneys, and other visitors to the recipient's office would not be exposed and vulnerable to the perception, absent separate personnel and facilities, that the Government supports the prohibited activities. Furthermore, the suggestion by plaintiffs that a mere disclaimer on documents submitted to courts and legislatures is sufficient to prevent the appearance of endorsement does not square with reality. Although judges and law clerks, as well as legislators and their aides, might notice the disclaimer, it is unlikely that the media would report the disclaimer to the public. Moreover, even if the disclaimer was announced at the commencement of or intermittently during a judicial or legislative proceeding, there is simply no reasonable assurance that members of the public attending various stages of the proceeding would be privy to the announcement.

██ Plaintiffs' contention that the regulations which direct the LSC to make determinations of program integrity on a case-by-case basis and not to place determinative weight on any one factor render them "vague and unworkable" fails as well, especially in light of *Rust.* Indeed, this contention runs directly contrary to the argument plaintiffs made in their reply memorandum, which criticized the interim regulations for imposing a rigid *"per se* test" rather than adopting from *Rust* a flexible test where no one factor would be determinative. Plaintiffs' Reply Memorandum at 10. Now that the LSC has revised its regulations to incorporate the same degree of flexibility as the *Rust* regulations, plaintiffs protest that the regulations are unworkable. Plaintiffs' abrupt about-face undermines the integrity of their reconstituted position. In any event, the *Rust* Court specifically noted, and gave its implicit approval to, the fact that the program integrity factors were "nonexclusive" and were to be applied through "case-by-case" determinations. 500 U.S. at 181, 111 S.Ct. at 1766. Nor are the program integrity requirements "void for vagueness." The separation factors give fair warning to recipients of the standards by which their program integrity compliance certifications will be evaluated. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); *cf. Finley v. National Endowment for the Arts,* 100 F.3d 671, 681 (9th Cir.1996) (striking down as unconstitutionally vague funding criteria requiring that art works show "decency and respect for the diverse beliefs and values of the American public"), *cert. granted,* —— U.S. ——, 118 S.Ct. 554, 139 L.Ed.2d 396 (1997). They are "sufficiently clear that the speculative danger of arbitrary enforcement does not render [them] void for vagueness." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 503, 102 S.Ct. 1186, 1195, 71 L.Ed.2d 362 (1982).

In respect to the recipients' program integrity compliance certifications, 45 C.F.R. § 1610.8(b), the LSC presumably will attach significant credence and presumptive validity to such certifications by recipient organizations, which are in the main staffed and/or supervised by members of the bar. This will

undoubtedly minimize the prospects of "as applied" litigation challenges. The Court therefore determines that the "case-by-case basis" and "no one factor is determinative" language, in conjunction with the separation factors, are appropriately tailored to advance the Government's interest in preventing the appearance of endorsement, and accordingly do not render the regulations facially invalid.

 Nor, in a similar vein, can the regulations be considered unconstitutionally overbroad. The Second Circuit has recently emphasized that overbreadth challenges are to be accepted "sparingly and only as a last resort," *Sanitation and Recycling Indus., Inc.*, 107 F.3d at 997 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973)), and that such a challenge "may prevail only if plaintiffs can show that an impermissible risk is created that ideas may be chilled whenever" the law is applied. 107 F.3d at 997. Further, "invalidation of a statute on its face is permitted 'only if the overbreadth is substantial.'" *Lebron v. National R.R. Passenger Corp.*, 69 F.3d 650, 660 (2d Cir.1995) (quoting *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574, 107 S.Ct. 2568, 2571, 96 L.Ed.2d 500 (1987)); *see also Dorman v. Satti*, 862 F.2d 432, 436 (2d Cir.1988) ("An act's overbreadth 'must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'") (quoting *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2917). This Court has not hesitated to invoke the overbreadth doctrine in the face of a facial constitutional challenge whenever a challenged regulation "does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that constitute an exercise" of protected constitutional rights. *See Scott v. Goodman*, 961 F.Supp. 424, 427 (E.D.N.Y.1997) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940)). Such, however, is plainly not the present case since neither the Act nor the regulations can plausibly be perceived as having such a preclusive effect upon the exercise of the plaintiffs' or third parties' First Amendment rights.

Having determined that the program integrity requirements are appropriately tailored to advance the Government's legitimate interest in preventing the appearance of endorsement and that they are not overbroad, the Court now turns its attention to plaintiffs' overarching argument that "the affiliate rules in *Rust* do not provide the benchmark where, as here, the restrictions strike at the heart of activities that are laden with First Amendment value." Letter to the Court from E. Joshua Rosenkranz, dated May 27, 1997 (quoting Plaintiffs' Reply Memorandum at 2).

There is no quarrel amongst the parties, nor could there be, that when the Government imposes upon the time-honored functions of the lawyer and, in particular, the lawyer-client relationship, it treads deeply in waters bound up in First Amendment sensibilities. As the Court in *LASH I* correctly assessed, the restrictions embodied by the Act impact, under the umbrella of the First Amendment, a broad range of rights affecting the pursuit and vindication of legal interests, including the right to lobby legislators and administrators, access to the courts, and even the confidential nature of the relationship between lawyers and prospective clients. *LASH I*, 961 F.Supp. at 1408–09. Because of the spate of new restrictions which Congress has now added to its prior restrictions upon LSC recipients, and the broad range of First Amendment rights arguably impacted by these restrictions, plaintiffs contend that *Rust* is not an appropriate analogue since the limited and narrowly drawn abortion counseling constraints did not significantly, if at all, impinge on the doctor-patient relationship. By contrast, plaintiffs assert that the profundity of the lawyering restrictions here at issue do indeed affect the fundamental nature of lawyering and the attorney-client relationship.

 The Court in *Rust* recognized that there are certain traditional spheres of free expression "so fundamental to the functioning of our society" that the Government's ability to restrict basic First Amendment rights within that sphere by attaching conditions to the expenditure of Government funds "is restricted by the vagueness and over-

breadth doctrines of the First Amendment," meaning in that context that the restriction, if justified at all, must be especially precise. *Rust,* 500 U.S. at 200, 111 S.Ct. at 1776 (citing *Keyishian v. Board of Regents, State Univ. of N.Y.,* 385 U.S. 589, 603, 605–06, 87 S.Ct. 675, 683, 684–85, 17 L.Ed.2d 629 (1967)) ("We emphasize once again that '(p)recision of regulation must be the touchstone in an area so closely touching our most precious freedoms,'" 385 U.S. at 603, 87 S.Ct. at 683, quoting *N.A.A.C.P. v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)). The *Rust* Court surmised by analogy that it could be argued "that traditional relationships such as that between doctor and patient should enjoy [special] protection under the First Amendment from Government regulation, even when subsidized by the Government." *Id.* The lawyer-client relationship obviously is at least on equal First Amendment footing with the doctor-patient relationship, and given the panoply of the constitutional rights of association and speech adhering to the attorney-client relationship, one could conceivably argue that the First Amendment is even more caught up in the lawyer-client relationship than the doctor-patient relationship.

The Court in *Rust,* however, did not deem it necessary to explore the nature of the doctor-patient relationship since it was of the opinion that the Title X program regulations did not "significantly impinge" upon that relationship because "[n]othing in them requires a doctor to represent as his own any opinion that he does not in fact hold." *Id.* In that respect, the Court attached significance to the fact that the regulations did not preclude the doctor from advising the patient that "advice regarding abortion is simply beyond the scope of the program." It concluded, therefore, that "[i]n these circumstances, the general rule that the Government may

choose not to subsidize speech applies with full force." *Id.*

 While the Court obviously has reverence for the majesty of the law, the restrictions pertaining to LSC recipients do not significantly impinge on the lawyer-client relationship, especially when contrasted with Title X's proactive aspects. Indeed, they simply proscribe the activities in which LSC recipients may engage.[15] Moreover, the extent of the activities which LSC recipients are prohibited from engaging in cannot enter into the constitutional mix since it is bedrock law that Congress need not fund the exercise of constitutional rights, regardless of their magnitude. *See Lyng v. International Union, United Auto., Aerospace and Agric. Implement Workers,* 485 U.S. 360, 368, 108 S.Ct. 1184, 1190, 99 L.Ed.2d 380 (1988) ("We have held in several contexts [including the First Amendment] that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.") (quoting *Regan v. Taxation with Representation,* 461 U.S. 540, 549, 103 S.Ct. 1997, 2002, 76 L.Ed.2d 129 (1983)). It matters not, therefore, whether one or more activities are proscribed since the numerosity of prohibited activities is not correlated to constitutional concerns. Furthermore, in contrast to the limited nature of doctor-patient counseling provided for in *Rust,* the regulations, as interpreted by LSC's counsel, broadly promote the lawyer-client relationship by providing that the lawyer may counsel the client, refer the client to another attorney, and explain to the client that LSC restrictions preclude the lawyer from engaging in the activity the client may wish to undertake. The Court will take the LSC at its word and will take a critical view, as other courts should as well, of any restrictions on such basic lawyering, in addition to any unreasonable rejections of recipients' certificates of compliance with the

---

**15.** For this reason, the Court also rejects plaintiffs' contention that *Rust* is distinguishable because here recipients are not acting as Government "mouthpieces." Tr. at 46–47. As the Supreme Court recently clarified in *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 829–30, 115 S.Ct. 2510, 2516–17, 132 L.Ed.2d 700 (1995), the "government as speaker" analysis is only implicated when the Government engages in viewpoint, rather than content, discrimination. Congress can constitutionally define the scope of its funding programs by excluding subject matter regardless of whether it is attempting to convey a particular message. *Cf. Rosenberger,* 515 U.S. at 831, 115 S.Ct. at 2517 ("By the very terms of the [regulation], the [government] does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints.").

program integrity requirements, if such issues should arise in any future "as applied" litigation.

In respect to plaintiffs' rather casual due process and equal protection claims, their due process argument fails for the same reasons the analogous claim failed in *Rust*— namely, because plaintiffs are not absolutely precluded from engaging in prohibited activities and, furthermore, have no constitutional entitlement to the benefits provided by the legal services program. 500 U.S. at 201–02, 111 S.Ct. at 1776–77. The Court rejects plaintiffs' equal protection argument since, as explained throughout this decision, the Government had a rational basis for restricting the activities of recipients, and because poverty is not a suspect classification. *See LASH II*, 981 F.Supp. at 1300; *see also Maher v. Roe*, 432 U.S. 464, 471, 97 S.Ct. 2376, 2380, 53 L.Ed.2d 484 (1977) ("this Court has never held that financial need alone identifies a suspect class for purposes of equal protection" analysis).

### CONCLUDING COMMENTS

This is not the same case that first came to the Court. It was entirely plausible for plaintiffs to initially challenge the constitutionality of the laundry list of prohibited activities wrought by the Act. Regardless of whether the Court would have agreed with all or any part of its sister court's constitutional conclusions in *LASH I*, this litigation, as plaintiffs have acknowledged, took on vastly different contours once the LSC responded to the compelling concerns raised in *LASH I* by enacting the interim regulations, and further responded in its final regulations to the plaintiffs' concerns regarding the interim regulations and to the Court's entreaties during the course of the litigation. In many ways, the litigation stands as a testament to the continued vibrancy and vitality of the very First Amendment rights at the heart of this lawsuit—access to the courts, free and open public debate, and freedom to associate for the vindication of legal rights. It also reflects the value of advocacy in the judicial setting by protagonists acting at the highest level of the legal profession. In that regard, plaintiffs are commended for bring-

ing and furthering this litigation; defendants are commended for appropriately addressing plaintiffs' concerns.

### CONCLUSION

Plaintiffs have failed to establish a probability of success on the merits of their facial constitutional challenge, and their preliminary injunction motion is therefore denied.